# In the United States Court of Federal Claims

**No. 22-1298C**

**Filed: May 21, 2024**

```
* * * * * * * * * * * * *     *
                              *
JOSHUA L. REINHARD,           *
                              *
              Plaintiff,      *
                              *
      v.                      *
                              *
UNITED STATES,                *
                              *
              Defendant.      *
                              *
* * * * * * * * * * * * *     *
```

**Carol A. Thompson**, Federal Practice Group, Washington, D.C., for plaintiff.

**Douglas G. Edelschick**, Senior Trial Counsel, Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for defendant. With him were **Steven J. Gillingham**, Assistant Director, Commercial Litigation Branch; **Patricia M. McCarthy**, Director, Commercial Litigation Branch; and **Brian M. Boynton**, Principal Deputy Assistant Attorney General, Civil Division. **Lt. James B. Ferguson**, Office of Claims & Litigation, United States Coast Guard, Washington, D.C., of counsel.

## O P I N I O N

### HORN, J.

The above captioned case was filed by plaintiff Joshua L. Reinhard, a former Marine Science Technician in the United States Coast Guard. He was involuntary separated from the United States Coast Guard on September 16, 2016, with a "General Discharge, for Misconduct, due to Commission of a Serious Offense." Plaintiff alleges in his complaint that the United States Department of Homeland Security's Board for Correction of Military Records (BCMR) improperly denied his request "for correction of his erroneous and unjust discharge."[1] Plaintiff claims that while the BCMR acknowledged that the investigation that led to his discharge was "riddled with errors," the BCMR "still denied Plaintitf's [sic] petition." (alteration added). After plaintiff filed his complaint, the parties filed cross-motions for judgment on the Administrative Record, which have been fully briefed.

---

[1] The case was initially assigned to Judge Mary Ellen Coster Williams, and was reassigned to the undersigned on July 5, 2023.

**FINDINGS OF FACT**

Plaintiff served eighteen years and ten months in the United States Coast Guard. Plaintiff entered active duty on October 7, 1997, and was separated with a "General Discharge, for Misconduct, due to Commission of a Serious Offense" without probation or the opportunity to retire on August 17, 2016.

Plaintiff's many years of service also included repeated alcohol-related misconduct and allegations of alcohol related behavior. In December 2000, Officer S. W. Cantrell issued plaintiff his first documented "alcohol incident" on Coast Guard Form CG-3307, referred to as a "Page 7." The Page 7 stated: "On 08DEC00, you were involved in an alcohol incident where your use of alcohol may have been abusive. Specifically, you found passed out in the female bathroom of a bar in New Orleans and were escorted off the premises by a bar's employee." The Page 7 continued: "This type of unacceptable behavior brings discredit upon the United States Coast Guard and your unit and will not be tolerated." The Page 7 stated: "You have been counseled on USCG [United States Coast Guard] policies concerning alcohol use and abuse as well as the serious nature of this incident." (alteration added). The Page 7 recommended:

> It is recommended that you abstain from alcohol until your relationship with alcohol can be determined. Education and/or treatment will be offered to you as per your screening result. This is considered your first documented alcohol incident. Per Chapter 20 of the Personnel Manual, any future alcohol incidents can result in your separation from the service.

On December 14, 2000, Officer Cantrell issued plaintiff another Page 7, which stated:

> Petty Officer Reinhard was involved in an alcohol related incident on 00DEC08. Petty Officer Reinhard never accepted responsibility for his actions. In a subsequent investigation, Petty Officer Reinhard made disparaging remarks about several of his subordinates. Petty Officer Reinhard often complained to junior members about his supervisor and of his duties aboard this unit.

On October 10, 2014, Lieutenant Commander B.A. Henderson investigated plaintiff for several violations of the Uniform Code of Military Justice, specifically: Article 86, Absence Without Leave; Article 111, Drunken or Reckless Driving; and Article 134, Disorderly Conduct, Drunkenness. The investigation stated because Lieutenant Commander Michael Lalor believed that plaintiff "looked drunk" and "was slurring his speech" at the 2014 Annual Chief Warrant Officer's Association Golf Scramble in New Iberia, Louisiana. As noted in the subsequent BCMR's decision, given a lack of evidence about how much alcohol was consumed, it was "recommended that the charges under Articles 111 and 134 be dismissed."[2]

_____

[2] The BCMR noted: "Regarding the AWOL [Absent Without Leave] offense," the investigation "concluded that the AWOL offense was supported by a preponderance of

On March 3, 2015, Lieutenant Junior Grade (LTJG) Jennifer Lloyd filed a civil rights complaint against plaintiff. Lieutenant Junior Grade Lloyd indicated that plaintiff, in an intoxicated state, had approached her and said: "I am so sexually attracted to you that I don't know how to balance that." In response to Lieutenant Junior Grade Lloyd's civil rights complaint, Captain P.C. Schifflin appointed Lieutenant D.T. Newcomb to conduct "a Standard Investigation into the facts and circumstances surrounding potential violations of the Uniform Code of Military Justice (UCMJ) and/or potential alcohol incident by MSTC [Marine Science Technician] Joshua Reinhard on or about 01 Feb to 27 Feb 2015." (alteration added).

On May 5, 2015, Lieutenant Newcomb produced a Preliminary Inquiry Officer Report. Lieutenant Newcomb's May 5, 2015 Preliminary Inquiry Officer Report included interview notes from thirteen witnesses. At the beginning of the Preliminary Inquiry Officer Report, Lieutenant Newcomb stated:

> Exhibits 1-13 and 16 document interview notes taken by me in the presence of the interviewee. At the conclusion of the discussion, the interviewee reviewed the notes to ensure their accuracy and completeness. After agreement from each interviewee that the notes accurately reflected the conversation, I saved the file and did not make any further changes to the text. There are signatures on most of these exhibits; however MSTC Reinhard has been advised by his legal counsel to not sign the notes from his interview. Additionally, I have contacted interviewees and I am still waiting on the signatures from a few of them (Exhibits 7, 10, 12, and 15), which I will provide upon receipt.

Lieutenant Newcomb's May 5, 2015 Preliminary Inquiry Officer Report also noted that he investigated incidents between plaintiff and three members of the Coast Guard, who were among thirteen witnesses included in the May 5, 2015 Preliminary Inquiry Officer Report. The May 5, 2015 Preliminary Inquiry Officer Report's findings of fact began:

> 1. MSTC Reinhard is an active duty member of the Coast Guard. He enlisted in the Coast Guard on 07 October 1997. His current term of enlistment is 31 October 2027. He reported to MSU [Marine Safety Unit] Morgan City on 31 July 2013. His current duties are as the Federal On-Scene Coordinator Representative.

> 2. Since the investigation began, MSTC Reinhard has been shifted from Facilities to Investigations.

(alteration added).

the evidence because the applicant had not timely contacted LCDR L [Lieutenant Commander Michael Lalor]," but it was "recommended that the CO [commanding officer] not prefer the charge." (alterations added).

Under the heading "MTS2 McKibben incident," Lieutenant Newcomb's Preliminary Inquiry Officer Report continued:

3. On or about the evening of 16 February 2015, MSTC Reinhard was at a local drinking establishment, The Drink House (501 1st St. Morgan City, LA). He was with other members of the Coast Guard, both civilians and military, celebrating Lundi Gras (the evening before Mardi Gras).

4. Mr. Ronnie Wiggins was speaking with MSTC Reinhard at some point during the evening. During this conversation, MSTC Reinhard purportedly made a statement referencing two married military members of MSU Morgan City, MST2 [Marine Science Technician Second Class] Christopher McKibben and MST2 Britany McKibben, who were also at the drinking establishment. MSTC Reinhard stated the following, or words to this effect, "I am going to make sure that they are not going to be stationed together following this summer's transfer. I'm going to make Britany [McKibben] my wife."

5. Mr. Wiggins did not believe that MSTC Reinhard was intoxicated at the time that this statement was made. He also did not perceive this to be a joke.

6. Mr. Wiggins was so bothered by this statement, that he approached MST2 C[hristopher] McKibben later that night, outside of the bar, and relayed this statement to him.

7. MST2 C McKibben later told his wife, MST2 B[ritany] McKibben about the statement. Neither MST2 C. McKibben nor MST2 B. McKibben heard the statement directly."

8. B. McKibben works in Facilities at MSU Morgan City under the direct supervision of MST1 [Marine Science Technician First Class] Aubrey Alexander. MST1 Aubrey Alexander works under the direct supervision of MSTC Reinhard. At the time of the incident, there were approximately 20 personnel in the Facilities section. Of those persons, approximately five were female.

9. B. McKibben had worked directly with MSTC Reinhard prior to 16 February 2015. She does not characterize any of their prior interactions as sexually harassing in nature. Based on conversations they have had, she believes him to have difficulties with sleeping and drinking. She did not offer particularized examples of either and has never complained to her chain of command or outside of her chain of command that he could not complete his duties due to perceived intoxication or lack of sleep. She did

4

note that MSTC Reinhard discusses his emotions with regard to his divorce and difficult family relationships freely in the workspace.

10. On or about 18 February 2015, MST2 B. McKibben confronted MSTC Reinhard while in the workspace regarding the purported statement that was made on 16 February 2015 to Mr. Wiggins, MSTC Reinhard denied to her his making that statement.

11. MSTC Reinhard confronted MST2 C. McKibben and denied having made the statement. MSTC Reinhard requested to know who reported that he had made the statement. MST2 C. McKibben declined to provide that information.

12. At the end of that conversation, MST2 C. McKibben reportedly told MSTC Reinhard, "I think it was just miscommunication or confusion. I'm not too concerned about it."

13. MST2 B. McKibben does not feel comfortable being alone with MSTC Reinhard and has requested that she not be sent to facilities inspections alone with him.

14. When questioned during this investigation about this statement, MSTC Reinhard denied having made the statement. He then elected to speak with an attorney before I copied a statement made by him verbatim regarding the incident involving this alleged statement.

(alterations added; internal references omitted).

Lieutenant Newcomb's May 5, 2015 Preliminary Inquiry Officer Report also detailed facts relating to incidents involving plaintiff and Lieutenant Junior Grade Lloyd:

23. LTJG Jennifer Lloyd reported to MSU Morgan City on or about February 2014. She directly supervises MSTC. Almost immediately, their working relationship was strained.

24. Multiple members of the command have noticed the strain in their working relationship. However, no particularized facts (other than "eye rolling") were presented to explain in what manner they exhibited difficulty or unprofessional ism working together.

25. When she moved to Morgan City, LTJG Lloyd moved into a condominium located directly adjacent to MSTC Reinhard's home. Their homes were connected and shared a wall on one side. MSTC Reinhard's

address is:[3] LTJG Lloyd's address was: LTJG Lloyd's moved out of that residence on or about 01 April 2015.

26. LTJG Lloyd and MSTC Reinhard have a history of supporting each other personally. For example, MSTC Reinhard loaned LTJG Lloyd his trailer, battery charger, and leaf blower. He shared Wi-Fi with her. At her request, he has picked up medications from Walgreens for her.

27. During the last week of February 2014, LTJG Lloyd was attending "Industry Day" with industry personnel/spouses and Coast Guard personnel/spouses. One aspect to this event was at local bars in the area.

28. LTJG Lloyd went to two different bars in support of this event. She noted that MSTC Reinhard became increasingly and aggressively drunk throughout the afternoon. He attempted to get her to remain at the event by asking her to take shots of liquor with him. She refused and left the event shortly thereafter. She did not report MSTC Reinhard's behavior to her chain of command.

29. During the afternoon of 01 March 2014, LTJG Lloyd was gardening in her front yard. She was wearing a v-neck t-shirt. MSTC Reinhard approached her and began speaking with her. She noticed that he was attempting to look down her shirt while she leaned forward; She told him to stop staring at her "tits." He purportedly giggled and remarked that she had noticed what he was doing.

30. MSTC Reinhard did not recall this gardening incident when questioned in the course of this Investigation.

31. On the evening of 01 March 2014, LTJG Lloyd was attending a block party in her residential neighborhood."

32. At some point during the evening, MSTC Reinhard approached LTJG Lloyd. He was visibly intoxicated. She recalls him saying the following, "I want to say something, but I'm not sure that I should. I am so sexually attracted to you that I don't know how to balance that (personal and professional interactions with LTJG Lloyd)."

33. When questioned about this statement in the course of this investigation, MSTC Reinhard offered as explanation for what he said to her: that he had been drinking.

34. LTJG Lloyd reported this incident on 03 March 2014 to her chain of command.

---

[3] The addresses for plaintiff and Lieutenant Junior Grade Lloyd were redacted in Lieutenant Newcomb's May 5, 2015 Preliminary Inquiry Officer Report.

35. LT [Lieutenant] Eric Brooks and LCDR [Lieutenant Commander] Keith Smith were notified of this incident directly by LTJG Lloyd. LCDR Smith then notified the then-Deputy of MSU Morgan City, CDR [Commander] Blake Wilborn.

36. CDR Wilborn transferred in Summer 2014 and was replaced by CDR Felton Gilmore.

37. While the members of the chain of command did discuss the incident, no investigation into the details of the situation was ordered. No administrative measures were pursued other than informal counseling.

38. LTJG Lloyd conducted the informal counseling session with MSTC Reinhard on 10 March 2014. Her statements immediately after the counseling session were positive and recount that the issue was addressed and they planned to move forward in a professional manner.

39. In the months after the counseling session, LTJG Lloyd told other members of the command about the incident which took place at the block party.

40. During the summer of 2014, MSTC Reinhard requested that LTJG Lloyd be removed from his marking chain of command; she was removed.

41. The block party incident resurfaced as a point of contention in September 2014, when MSTC Reinhard was upset about low marks on his EER [Enlisted Evaluation Report]. He appealed, citing that he was being punished for the block party incident.

42. In February 2015, LTJG Lloyd was home sick from work. MSTC Reinhard came home from work during lunchtime, approached her living room window, and looked inside.

43. LTJG Lloyd saw MSTC Reinhard peering through her window. He addressed her and asked if she was alright. LTJG Lloyd felt uncomfortable with his peeping into her home.

44. According to MSTC Reinhard, he approached the window to play with LTJG Lloyd's cat, who was sitting by the window.

45. Later in the day, LTJG Lloyd was working on her car because the battery was dead. MSTC Reinhard returned to the house while she was outside working on the car. He offered to assist her. She declined a need for assistance.

46. MSTC Reinhard went into his house and returned a few minutes later with a battery charger. Again, LTJG Lloyd refused his assistance. He returned to his home.

47. Specifically, LTJG Lloyd reportedly stated, "You've ruined my life. You've ruined my career. You've ruined my time here. I hate living here. I don't want to borrow anything from you ever again. I won't ask to borrow anything from you again. Don't offer lo lend me anything again."

48. At some point thereafter, LTJG Lloyd was inside her home when she heard a knock at her door. When she opened the door, she discovered MSTC Reinhard and OCSC [Operations Senior Chief] Stephon Allen on her doorstep. MSTC Reinhard stated that they were there to assist her with her car. Visibly upset, LTJG Lloyd again refused assistance.

49. LTJG Lloyd felt uncomfortable with MSTC physical proximity and persistency, despite requests to be left alone. She feared for her safety and requested that an MPO [Military Protective Order] be put in place to restrict MSTC Reinhard's movements with regard to approaching her home while she remained living there.

50. LTJG Lloyd has since moved out of that home and the MPO has expired.

(alterations and footnote added; internal references omitted).

Lieutenant Newcomb's May 5, 2015 Preliminary Inquiry Officer Report noted that:

At 1117, I began to suspect MSTC Reinhard of making a false official statement to me about a certain event I was questioning him about. I immediately stopped the interview, amended the Article 31 (b) rights form to include "Article 107 - False Official Statement"[4] at the bottom of the

---

[4] Article 107 of the Uniform Code of Military Justice (UCMJ), titled: "False official statements; false swearing," provides:

(a) False official statements.--Any person subject to this chapter who, with intent to deceive--
(1) signs any false record, return, regulation, order, or other official document, knowing it to be false; or
(2) makes any other false official statement knowing it to be false;
shall be punished as a court-martial may direct.
(b) False swearing.--Any person subject to this chapter--
(1) who takes an oath that--
(A) is administered in a matter in which such oath is required or authorized by law; and
(B) is administered by a person with authority to do so; and

first page. I explained my action to MSTC Reinhard, reviewed the form with him again, and asked him to initial in the desired boxes once again. In order to keep the form as orderly as possible, I made a new column on the left-hand side of the form along with a new set of boxes at the bottom of the form. MSTC Reinhard initialed box "c", called his legal representative on the telephone and spoke with him for approximately 25 minutes. At the conclusion of the phone call, MSTC Reinhard initialed box "b" and said that he would like to make a statement regarding this "McKibben marriage" statement. At 1143, we started the interview once again, and I copied his verbal statement verbatim and then concluded the interview because I did not have any further questions.

(footnote added). Lieutenant Newcomb's May 5, 2015 Preliminary Inquiry Officer Report offered a series of "Recommendations" at the end of the Preliminary Inquiry Officer Report:

1. Because alcohol was a causative factor in MSTC Reinhard making certain statements to LTJG Lloyd, he should be deemed to have committed an alcohol incident on 1 March 2014. (Opinion 2).

2. Because MSTC Reinhard shows signs of alcohol abuse, I recommend that he be referred for screening in accordance with the procedures outline in the Coast Guard Health Promotion Manual, COMDTINST M6200.1(series). (Opinions 2, 3).

3. I recommend that MSTC Reinhard's command document, in writing, any further incidents of alcohol abuse or potential alcohol incidents.

4. I recommend that the command offer refresher training about bystander intervention for shipmates suspected of potentially driving while intoxicated.

5. I recommend that MSTC Reinhard be offered Non-Judicial Punishment for the following violations of the UCMJ: Article 89[5] (4 Specification) and Article 107 (1 Specification).

---

(2) who, upon such oath, makes or subscribes to a statement;
if the statement is false and at the time of taking the oath, the person does not believe the statement to be true, shall be punished as a court-martial may direct.

UCMJ 107, 10 U.S.C. § 907 (2018).

5 Article 89 of the UCMJ, titled: "Disrespect toward superior commissioned officer; assault of superior commissioned officer," provides:

6. I recommend that MSTC Reinhard be formally counseled, subsequent to the Non-Judicial Punishment, as to appropriate conversation topics in the work place, specifically with regard to curbing his continued inappropriate conversations about his girlfriends, divorce, family relationships, etc.

7. In addition, I recommend that MSTC Reinhard be reminded about the opportunities for support from CGSUPRT [Coast Guard Support] and the Command Chaplains.

8. I recommend that the command document, formally and in writing, any future disrespectful, discrediting, and prejudicial behaviors engaged in by MSTC Reinhard.

9. I recommend that the command offer additional training to all members of MSU Morgan City with regard to civil rights and the processes available to those who feel as though they are suffering under a hostile, offensive, or abusive work environment.

(footnote added; alteration added).

After receiving Lieutenant Newcomb's May 5, 2015 Preliminary Inquiry Officer Report, on June 8, 2015, Captain D.G. McClellan issued another Page 7 to plaintiff, stating:

I have determined that you committed an alcohol incident on 01MAR14. Your consumption of alcohol was determined to be a significant and/or causative factor in your approaching your direct supervisor, a female commissioned officer, and despite her urging you to remain silent as to what you were struggling to say, you chose to ignore her advice and continued to state to her, "I am so sexually attracted to you that I don't know how to balance that." This conduct constitutes a violation of the

---

(a) Disrespect.--Any person subject to this chapter who behaves with disrespect toward that person's superior commissioned officer shall be punished as a court-martial may direct.
(b) Assault.--Any person subject to this chapter who strikes that person's superior commissioned officer or draws or lifts up any weapon or offers any violence against that officer while the officer is in the execution of the officer's office shall be punished--
(1) if the offense is committed in time of war, by death or such other punishment as a court-martial may direct; and
(2) if the offense is committed at any other time, by such punishment, other than death, as a court-martial may direct.

UCMJ 89, 10 U.S.C. § 889 (2018).

Uniform Code of Military Justice. You were previously counseled on Coast Guard policies concerning alcohol use and abuse as well as the serious nature of an alcohol incident.

The Page 7 continued: "This is considered your second documented alcohol incident. Your first documented alcohol incident occurred on 08 May 2000. Your second alcohol incident occurred on 01MAR2014. You will be processed for separation, in accordance with Chapter 2 of the Coast Guard Drug and Alcohol Abuse Program, COMDTINST M 1000.10 (series)." (capitalization in original).

On July 2, 2015, plaintiff filed a civil rights complaint against Lieutenant Junior Grade Lloyd alleging that he was the victim of a hate incident. A Coast Guard investigation conducted by Captain P.C. Schiffler determined that plaintiff's complaint was "unsubstantiated."

On July 13, 2015, Lieutenant Junior Grade Lloyd filed a second civil rights complaint alleging that plaintiff retaliated against her by alleging that she committed a hate incident against him. A Coast Guard investigation conducted by Lieutenant C.M. Dimitroff determined that plaintiff had filed his complaint in retaliation against Lieutenant Junior Grade Lloyd's complaint. On August 6, 2015, Captain McClellan notified plaintiff that he was being separated from the Coast Guard for Alcohol Abuse and Commission of a Serious Offense. On October 26, 2015, Captain McClellan issued plaintiff another Page 7 for his retaliatory civil rights complaint.

While preparing for the separation, the Coast Guard ran a criminal background check on plaintiff and discovered that plaintiff had been arrested for driving under the influence of alcohol by civilian authorities on April 10, 2010. Plaintiff had not reported the arrest to his unit, contrary to Coast Guard policy.[6] On December 2, 2015, plaintiff once again received counseling. Plaintiff's Page 7 dated December 2, 2015 counseling states:

I have determined that you committed an alcohol incident on 10APR10. Your consumption of alcohol was determined to be a significant and/or causative factor in your being arrested for Driving While Impaired by Alcohol by a Harford County Sheriff's Officer. You were seen operating a vehicle traveling 81 mph in a 55 mph zone. When the officer pulled you over, the officer detected a strong odor of alcohol emanating from your breath. After failing multiple field sobriety tests, you were placed under arrest and transported to the Harford County Sheriff's Office Southern Precinct. You agreed to submit to an intoximeter EC/IR test resulting in an alcohol concentration of 0.15 grams of alcohol per 210 liters of breath,

---

[6] Under the Drug and Alcohol Abuse Program Manual, COMDTINST M1000.10 (Sept. 29, 2011), and the Personnel Manual in effect in 2010, COMDTINST M1000.6A (Apr. 23, 2010*)*, a Driving Under the Influence (DUI) offense must be documented as an alcohol incident in the service member's military record, and the member need not have been convicted.

almost two times over the legal limit. This conduct constitutes a violation of the Uniform Code of Military Justice.

You received your first alcohol incident in December 2000. This would have been your second alcohol incident, but you failed to report this incident to your command. This incident recently became known to this command and is considered to be your third alcohol incident.

(capitalization in original). The Page 7 continued: "Because this is your third alcohol incident, you will be processed for separation, in accordance with Chapter 2 of the Coast Guard Drug and Alcohol Abuse Program, COMDTINST M 1000.10 (series)." (capitalization in original). Plaintiff did not sign the Page 7 dated December 2, 2015.

On December 10, 2015 and December 11, 2015, the Coast Guard convened an Administrative Separation Board. The Administrative Separation Board reviewed Lieutenant Newcomb's May 5, 2015 Preliminary Inquiry Officer Report, heard testimony from Lieutenant Commander Lalor, and heard testimony from fifteen witnesses called by plaintiff. The Administrative Separation Board concluded that

Each of the three incidents documented as an alcohol incident in a CG-3307 meet the definition of an alcohol incident; therefore, they are properly characterized as alcohol incidents and Respondent [plaintiff Mr. Reinhard] has been involved in three alcohol incidents. Respondent attempted to hide the third alcohol incident from the Coast Guard. The basis for discharge under "Alcohol Abuse" at 1.B.15.b.(5) **has been met** based on the Respondent's three alcohol incidents. Each alcohol incident brought significant discredit to the Coast Guard, due to the public nature of each of the incidents and the larger impact to crew members associated with the incidents. The basis for discharge under "Commission of a Serious Offense" at 1.B.17.b.(3) **has been met** based on a preponderance of the evidence.

There is **not** enough evidence to support, by a preponderance of the evidence, a violation of Article 89, UCMJ, with regard to the Respondent calling LTjg [Lieutenant Junior Grade] Gibbings "stupid". There is **not** enough evidence to support, by a preponderance of the evidence, a violation of Article 89, UCMJ, with regard to the Respondent allegedly staring at LTjg Lloyd's breasts. There is enough evidence to support, by a preponderance of the evidence, a violation of Article 89, UCMJ, with regard to Respondent making a sexually suggestive advance toward LTjg Lloyd. The remarks proving the basis for discharge under "Commission of a Serious Offense" at 1.B.17.b.(3) were unprofessional in nature and contributed to an already uncomfortable work environment. The members' close living proximity provided opportunities for increased work tensions.

> There is enough evidence to support, by a preponderance of the
> evidence, a violation of Article 107, UCMJ, with regard to Respondent
> lying to the PIO [Lieutenant Newcomb] about certain statements he made
> about wanting to break up the McKibben's marriage.

(emphasis in original; internal references omitted; alterations added).

The Administrative Separation Board recommended that "[t]he Respondent
should be **separated** from the Coast Guard." (emphasis in original; alteration added).
The Administrative Separation Board explained its decision:

> The exhibits, findings of fact, and/ or opinions that support this
> recommendation are as follows:
>
> (1) 1.B.15.b.(5) Alcohol Abuse: All members of the Board agree and
> recommend that the Respondent should be separated from the Coast
> Guard if the basis for separation is Alcohol Abuse. See: Findings of fact 2,
> 3, 4, 5, 7, 11; and opinions 1-4.
>
> (2) 1.B.17 .b.(3) Commission of a Serious Offense: All members of the
> Board agree that the Respondent should be separated from the Coast
> Guard if the basis for separation is Commission of a Serious Offense. Of
> note: the members disagree as to how many offenses support this basis.
>
> (a) All members agree that a preponderance of the evidence proves one
> violation of Article 89, UCMJ, and that this violation in conjunction with
> other information in the record support a recommendation for separation.
> See: Findings of fact 19, 23, 24, 25, 26; and opinions 5, 9, 10.
>
> (b) A majority of the members agree that a preponderance of the evidence
> also proves a violation of Article 107, UCMJ, and that this violation in
> conjunction with the violation of Article 89, UCMJ, as well as other
> information in the record support a recommendation for separation. See:
> Findings of fact 19, 23-29, 31; and opinions 5,9,10,11.
>
> (c) A minority of the members believes that a violation of Article 107,
> UCMJ, is not supported by a preponderance of the evidence and therefore
> recommends that a separation of the Respondent should not be based
> solely on a violation of Article 107, UCMJ. A Minority Report is included as
> Enclosure (3) for explanation.

The Administrative Separation Board recommendations for plaintiff's
characterization of service differed depending on whether plaintiff had committed one
violation of Article 107. If plaintiff is separated for Alcohol Abuse or one violation of
Article 89 supporting Commission of a Serious Offense, then all Administrative
Separation Board members agreed that plaintiff's characterization of service should be

"Honorable" and allowed to voluntarily retire. If plaintiff is separated for both violations of Article 89 and 107 supporting Commission of a Serious Offense, however, then a majority of Administrative Separation Board members agreed that plaintiff's characterization of service should be "General, under honorable conditions" and not allowed to voluntarily retire. Ultimately, plaintiff was discharged with a "General, under honorable conditions" pursuant to the majority's findings. (capitalization in original). The Administrative Separation Board Report was endorsed by the Commander of Marine Safety Unit, Morgan City, and the Commander of the Eighth District.

On December 31, 2015, plaintiff submitted his rebuttal to the Administrative Separation Board, in which he indicated that he "disagrees with the majority's decision regarding Article 107, UCMJ," which stated:

> The [Administrative Separation] board based their Article 107, UCMJ decision on a 5 May 2015 Investigation conducted by LT D.T. Newcomb. In particular, the board relied on Exhibit 7 of LT Newcomb's investigation. Exhibit 7 is an unsworn and unsigned, interview summary, typed by the investigator. Here, the investigator called a witness named Ronnie Wiggins, via telephone, and asked him a few questions. The investigator then summarized the phone call into five short bullet comments. The witness never reviewed, verified, or swore to the accuracy of the summary. Based on this summary, the board found that MSTC Reinhard violated Article 107, UCMJ. The only witness that supports the Article 107 allegations is Ronnie Wiggins.

(alteration added). Plaintiff continued:

> The Wiggins evidence is unreliable and uncorroborated for the following reasons:
>
> i.      Ronnie Wiggins never made a sworn statement;
> ii.     He never made a written statement;
> iii.    He did not sign, date, or verify the accuracy of the summarized interview;
> iv.     He was never interviewed face-to-face;
> v.      The summary was based on a short phone conversation;
> vi.     He did not testify at the [Administrative Separation] board hearing or in any other proceedings;
> vii.    He was never made available for questioning by the board or the respondent;
> viii.   He was not placed under oath when his [sic] made the statement;
> ix.     He did not swear to the accuracy of the summarized statement; and
> x.      His memory of the night in question is weak. That night, he was intoxicated at a bar. When the investigator asked him whether MSTC Reinhard was intoxicated that night, he did not know and he recalled few other details about that night.

> Considering the above factor, his hearsay statement is unreliable and does not rise to the level of preponderance of the evidence. To rise to this level, evidence must be reliable and convincing. Its truth must be more probable than not. An unsworn, unsigned, uncorroborated, summary of a short phone call is not enough to reach this level of proof.

(alterations added). Additionally, in plaintiff's motion for judgment on the Administrative Record in this court, plaintiff alleged that: "Mr. Reinhard did not know at the time he submitted his rebuttal that the PIO's [Preliminary Investigative Officer's Lieutenant Newcomb's] alleged interview with Mr. Wiggins never actually occurred."

On August 17, 2017, the Final Reviewing Authority issued a final decision, approving all Administrative Separation Board majority findings. The Final Reviewing Authority addressed the evidence before the Administrative Separation Board, as well as plaintiff's rebuttal. The Final Reviewing Authority stated:

> I have reviewed the rebuttal comments from MSTC Reinhard's counsel, which assert that the evidence regarding the violation of Article 107,-UCMJ, was not supported by a preponderance of the evidence. However, the [Administrative Separation] Board Report contains sufficient evidence to support a finding, by a majority of the Board Members, that MSTC Reinhard made a false statement in violation of Article 107, UCMJ. The Board heard testimony from MSTC Reinhard and was able to assess his credibility to determine if he should be believed over other witnesses and evidence. The Board also pointed to multiple exhibits which they considered to determine whether or not MSTC Reinhard violated Article 107, UCMJ. In addition to the unsworn statement summary from Mr. Wiggins, the Board Members also noted written statements from Coast Guard members with information that led them to conclude that the statement from Mr. Wiggins was accurate. This is noted in Finding of Fact #31, which points to Exhibits 17, 18, 21, 27 and 28. In Finding of Fact #31, the Board stated: "Several members noted that Respondent had made other uncomfortable and suggestive comments about MST2 Brittany McKibben." Finding of Fact #31 was highlighted in the Recommendations of the majority of the Board Members that a preponderance of the evidence supports separation, with a General Discharge, without probation or the opportunity to retire.

(alteration added).

On September 16, 2016, the Final Reviewing Authority separated plaintiff from the Coast Guard "in accordance with Article 1.B.17.b.(3) of the Military Separations Manual, COMDTINST M1000.4 (series), with a General Discharge, for Misconduct, due to Commission of a Serious Offense." (capitalization in original).

15

As reflected in an affidavit submitted by the Final Reviewing Authority in a case filed in the United States District Court for the District of Columbia by plaintiff,[7] and included in the Administrative Record in this case, the Final Reviewing Authority affirmed:

> One of my duties in my current assignment is to serve as the Final Reviewing Authority for Administrative Separation Boards. I approved the Action of the Final Reviewing Authority for the Administrative Separation Board in the Case of MSTC Joshua L. Reinhard on 17 August 2016.
>
> After carefully reviewing the Administrative Record, I approved the Record, Findings of Fact, Opinions, and Recommendations of the Administrative Separation Board, and directed that MSTC Reinhard be separated from the Coast Guard, with a General Discharge, for Misconduct due to Commission of a Serious Offense. I made this decision because a majority of the Board recommended this outcome, after finding that MSTC Reinhard violated both Article 89 and Article 107 of the Uniform Code of Military Justice (UCMJ). I also personally believe based on my review of the record that he committed the offenses.
>
> A Minority Report, signed by one Member of the Administrative Separation Board, noted that this Member did not agree that the evidence supported a finding that MSTC Reinhard violated Article 107 of the UCMJ. This Member did agree that MSTC Reinhard violated Article 89 of the UCMJ.
>
> While a Minority Report was issued by one Member of the Board, the Administrative Separation Board was unanimous that the evidence supported a finding, by a preponderance of the evidence, that MSTC Reinhard should be separated from the Coast Guard for both Unsuitability, due to Alcohol Abuse and Misconduct, due to Commission of a Serious Offense. The Board was also unanimous that MSTC Reinhard should not be placed on probation, regardless of the basis for his separation,

---

[7] Plaintiff filed three separate cases in the United States District Court of the District of Columbia related to his discharge in advance of filing suit in the United States Court of Federal Claims. See Reinhard v. Mayorkas, No. 21-3350 (D.D.C. June 14, 2022); Reinhard v. Dep't of Homeland Sec., No. 18-1449 (D.D.C. July 11, 2019); Reinhard v. Johnson, et al., No. 16-1807 (D.D.C. Nov. 15, 2016). In Reinhard v. Mayorkas, plaintiff argued that the government had not corrected his military records, and the case was ultimately dismissed. In Reinhard v. Department of Homeland Security, plaintiff alleged the government had wrongfully withheld military records related to plaintiff's discharge, and the case was ultimately dismissed. In Reinhard v. Johnson, et al., plaintiff filed suit to enjoin the decision recommending plaintiff's separation on the grounds that false charges were made against him. As in the other two cases, Reinhard v. Johnson, et al., was dismissed. The affidavit submitted by the Final Reviewing Authority was submitted in connection with the Reinhard v. Johnson, et al. case.

because there was not a reasonable prospect for rehabilitation. However, a majority of the Members of the Board recommended that MSTC Reinhard should be authorized to retire if the basis for separation was Alcohol Abuse, or if the basis for separation was for Misconduct because MSTC Reinhard violated Article 89 of the UCMJ but did not violate Article 107 of the UCMJ.

After carefully reviewing the Administrative Record, I concluded that MSTC Reinhard violated both Article 89 and Article 107 of the UCMJ. As noted in the Action of the Final Reviewing Authority, I concluded that a Majority of the Members of the Administrative Separation Board appropriately relied upon other evidence, in addition to the summary of the interview with Mr. Ronnie Wiggins, to make the determination that MSTC Reinhard violated Article 107 of the UCMJ. This evidence included information from other witnesses regarding "uncomfortable and suggestive comments" made by MSTC Reinhard. This evidence also included the Administrative Separation Board's assessment of MSTC Reinhard's credibility after he made an unsworn statement to the Board.

Coast Guard Policy, in Article 1.B.22 of Military Separations, COMDTINST M1000.4, authorizes me to "take final action other than that recommended [by the Administrative Separation Board] without returning the record, if evidence of record supports that action and the final action states the specific reasons."

In this case, I was not required to take action contrary to the Administrative Separation Board because a majority of the Members of the Board recommended separation. However, if this Administrative Separation Board had been unanimous in the opinion that MSTC Reinhard did not violate Article 107 of the UCMJ, I would have taken action contrary to the recommendation of the Board, and ordered that MSTC Reinhard be separated from the Coast Guard, with a General Discharge. I would have taken this action because the Board found that, regardless of the basis for separation, there was not a reasonable prospect for rehabilitation. In addition, as I noted in the Action of the Final Reviewing Authority, the record clearly indicates that MSTC Reinhard created an offensive environment for three female workers, engaged in retaliation, and failed to learn from verbal counseling that was designed to correct his harassing behavior.

I am aware of the allegation that one witness statement, from Mr. Ronnie Wiggins, was not accurate. However, I reviewed the Administrative Record for this case, in light of that allegation, and concluded that I would have ordered that MSTC Reinhard be separated from the Coast Guard, with a General Discharge, even if this allegation was true. This is because, as noted above, the Administrative Separation Board found multiple bases

in Coast Guard policy which supported a decision to separate MSTC Reinhard. Even if MSTC did not make a false statement, in violation of Article 107 of the UCMJ, the evidence in the record supports a decision that he should be separated, with a General Discharge.

(alteration in original).

On February 12, 2020, plaintiff appealed to the BCMR, seeking

correction of my record to reflect an honorable discharge, correction of my record to reflect an end of active service date at the completion of 20 years of active service, correction of my record to reflect the reason for my discharge as voluntary retirement upon completion of 20 years of active service vice misconduct, with an appropriate narrative summary and RE [re-enlistment] code, removal of an erroneous Page 7 entry resulting from retaliation after I filed a civil rights complaint, and all applicable back pay. In addition, because I was not provided the necessary time, opportunity, or transition assistance prior to my separation to knowledgeably and properly request reassignment of benefits, I request that my Post-9/11 GI [Government Issue] bill benefits be assigned to my dependent daughter.

(alterations added).

Plaintiff's application to the BCMR also included an affidavit of Ms. Carol A. Thompson, who also represents plaintiff in the case now before this court. The affidavit stated, in part: "In the course of my assistance with this matter I spoke twice with Mr. Ronnie Wiggins. The first phone call was on 26 August 2016 and the second phone call was on 29 August 2016." Ms. Thompson's affidavit continued:

During the first phone call on 26 August, Mr. Wiggins relayed the following:

(1) He has never spoken to an investigator or anyone from the Coast Guard (CG) regarding an investigation into potential wrongdoing of MSTC Reinhard.

(2) After being informed by MSTC Reinhard that the command had produced interview notes from a supposed interview with him, he called MST2 Christopher McKibben to find out exactly what information the CG had.

(3) MST2 McKibben informed him that he would be contacted by the CG.

(4) On 22 August, Mr. Wiggins was contacted by a female CG servicemember who introduced herself as a judge advocate. She had Mr.

Wiggins on speaker phone. She played a recording of him speaking with MST2 McKibben.

(5) With respect to the recording, Mr. Wiggins does not recall if the interviewer ever introduced himself or informed Mr. Wiggins that he was being recorded. He was adamant that he never spoke with an investigator or an investigating officer. He thought he was having a one way [sic] conversation with his friend Christopher [McKibben].

(6) During the phone call with the judge advocate on 22 August, Mr. Wiggins was informed that if he ever wrote a statement recanting what he said during the conversation, that he would be subpoenaed, prosecuted, and put in jail. He was also told that Mr. Wiggins' statement was the "cherry on the sundae" for why MSTC Reinhard was being separated.

(alterations added). Ms. Thompson's affidavit continued:

During the second phone call with Mr. Wiggins on 29 August, he relayed the following:

(1) After he and I spoke on 26 August, he called the number from which he had been called on the 22nd. His intent in calling that number was to inform the CG that at this point, he did not want the CG to contact him any further involving this matter.

(2) He said that when he called the number, a male answered. I inquired if the male was LT Newcomb and he said "yes, that name sounds familiar," or words to that effect.

(3) He then stated that LT Newcomb proceeded to inform him, Mr. Wiggins, that he was unnecessary as a witness because MSTC Reinhard was being separated for "12 pages of alcohol related misconduct and criminal activities, including DUIs.". [sic] Mr. Wiggins had never heard of this information prior to being informed by LT Newcomb. Mr. Wiggins was also informed that the CG had been trying to separate MSTC [sic] for years based on the negative information they had on him. The way LT Newcomb, or whomever the male was that he spoke with, described MSTC Reinhard to Mr. Wiggins in such a way that it sounded like MSTC Reinhard had an extensive criminal history.

(4) Prior to ending the phone call, I asked Mr. Wiggins if he was ever contacted by the investigating officer to review interview notes and sign his name to them. He adamantly said that he was not. I further asked if he was sure that it was LT Newcomb that he spoke with on 26 August, to which he replied, "Yes, that's what I just told you."

(alterations added).

On April 15, 2022, the BCMR issued a 55 page Final Decision and denied plaintiff's application for correction of his military records. The April 15, 2022 BCMR decision first summarized the plaintiff's case before the BCMR noting:

> The applicant [plaintiff Mr. Reinhard] is a former chief petty officer who received a General discharge for misconduct in 2016 with almost 19 years of service. He argued that his discharge with no retirement was erroneous and unjust because-
>
> • the command climate was "toxic" throughout his tour and he was the target of a "witch hunt";
>
> • the officer who investigated the allegations of sexual harassment against him was biased, colluded with a witness to create false and unreliable evidence, and lied in his report;
>
> • as a result of the unjust investigation, his command erroneously and unjustly added two retroactive alcohol incidents to his record;
>
> • his command falsely accused him of using the civil rights complaint process to retaliate against his primary accuser;
>
> • the Administrative Separation Board (ASB) recommended the applicant's separation for "alcohol abuse" and alleged violations of Article 89 (Disrespect of a Superior Commissioned Officer) and Article 107 (False Official Statement) of the Uniform Code of Military Justice (UCMJ) based on unreliable and false evidence and no medical diagnosis of an alcohol abuse disorder; and
>
> • the Final Reviewing Authority (FRA) who directed the applicant's discharge acted outside the scope of and in direct contradiction of the ASB's findings and recommendations.
>
> The Board finds that the applicant's command acted appropriately by initiating an investigation into the sexual harassment complaints against him; documenting two past alcohol incidents in his record; and formally counseling him about misusing the civil rights complaint process to retaliate against his primary accuser. The Board also finds that the applicant has not proven by a preponderance of the evidence that the investigating officer was biased, colluded with a witness to create false evidence, or misled the ASB. The Board further finds that neither the ASB majority nor the FRA erred in finding by a preponderance of the evidence that the applicant could be discharged for alcohol abuse or for violating

Articles 89 and 107, UCMJ, and could be subject to receiving a General
discharge for misconduct with no retirement.

(alteration added). The BCMR explained in the summary:

> The Board finds that the applicant's command acted appropriately by
> initiating an investigation into the sexual harassment complaints against
> him; documenting two past alcohol incidents in his record; and formally
> counseling him about misusing the civil rights complaint process to
> retaliate against his primary accuser. The Board also finds that the
> applicant has not proven by a preponderance of the evidence that the
> investigating officer was biased, colluded with a witness to create false
> evidence, or misled the ASB. The Board further finds that neither the ASB
> majority nor the FRA erred in finding by a preponderance of the evidence
> that the applicant could be discharged for alcohol abuse or for violating
> Articles 89 and 107, UCMJ, and could be subject to receiving a General
> discharge for misconduct with no retirement.

The BCMR proceeded to provide a summary of the record, including plaintiff's
alcohol incidents, the Preliminary Inquiry Officer's investigations and recommendations,
the Administrative Separation Board hearing and Administrative Separation Board
Report, and the actions of the Final Reviewing Authority on the Administrative
Separation Board Report. The BCMR also provided a lengthy summary of plaintiff's
views of his alcohol incidents, the Preliminary Inquiry Officer's investigations and
recommendations, as well as the proceedings before the Administrative Separation
Board. The BCMR noted that plaintiff

> concluded by summarizing his arguments and by stating that the FRA's
> final action and his General discharge with no retirement were erroneous
> and unjust given his almost 19 years of honorable service. He stated that
> the FRA's final action was based on an "incorrect factual premise" that the
> majority of the ASB had recommended a General discharge with no
> retirement whereas the format shows that the single recommendation that
> the ASB had actually made was for an Honorable discharge with
> retirement. He stated that his General discharge has negatively affected
> his ability to gain employment, including his employment in the federal civil
> service, which would allow him to apply his 19 years of military service
> toward a civil service retirement.

After providing the context for its decision, the BCMR made a series of "**FINDINGS AND
CONCLUSIONS**," "based on the applicant's military record and submissions, the Coast
Guard's submissions, and applicable law." (capitalization and emphasis in original).

In the first three findings, the BCMR noted its jurisdiction over plaintiff's
application and noted that plaintiff's "application was not timely filed within three years of
the applicant's discharge," but "the record shows that the Coast Guard did not timely

respond to the FOIA [Freedom of Information Act] request by which he gathered the evidence he has submitted to the Board." (alteration added). Therefore, the BCMR found "that it is in the interest of justice to excuse the untimeliness of the application and consider the case on the merits." For the fourth finding, the BCMR determined:

> 4. **October 2014 Investigation**: The applicant alleged that the October 2014 investigation was baseless and the start of a "witch hunt" by the command to discharge him. The record shows that the applicant was one of three members that LCDR L[alor] had reported being intoxicated at the golf tournament. Although the PIO found the possible charges to be unsubstantiated because he could not find witnesses who reported seeing the applicant overindulge in alcohol, a chief warrant officer did support LCDR L's claim that the applicant had appeared to be intoxicated. The Board finds no grounds for concluding that this investigation was the start of a "witch hunt" against him or an attempt to have him discharged.

(emphasis in original; alterations added). The April 15, 2022 BCMR decision continued:

> 5. **FJO's[8] [LTJG Lloyd's] Neighborly Interactions with the Applicant [Plaintiff Mr. Reinhard]:** In early February 2014, the FJO was assigned to the applicant's unit and she rented a house with a garage that shared a common wall with the applicant's garage. Their driveways were side by side, but their front doors were around the corners, facing opposite each other. The record shows that the FJO borrowed several things from the applicant as his new neighbor, including his trailer, charger, and Wifi. In addition, at some point during her first year at the unit, the applicant picked up a prescription medication for her at a local pharmacy when she was ill. The record also shows that because they lived in the same neighborhood, the FJO and the applicant occasionally attended the same Mardi Gras events and parties, but there is no evidence that they attended these events together or interacted as a romantic couple.
>
> 6. **March 1, 2014, Alcohol Incident:** The applicant alleged that on March 1, 2014, he told the FJO only that he and others found her attractive and that he did so in the context of a conversation about finding romantic partners in that area. The record shows, however, that the FJO reported his conduct to her supervisor shortly afterward and that the applicant was counseled about it informally based on the XO's [executive officer's] recommendation. There is no evidence that the applicant disputed the FJO's account of their interaction at the time, and according to LCDR S's statement, the FJO's statement to the PIO about what the applicant had said to her that day was the same thing that she told her supervisors shortly after the incident in March 2014. The Board agrees with the PIO that the preponderance of the evidence shows that the applicant had been drinking alcohol at a party before he told the FJO that men she had been

---

[8] FJO stands for Female Junior Officer.

playing "washers" with at the party had said she was "hot" and that he himself was so sexually attracted to her, he did not know how to "balance that."

The applicant thereafter asked that the FJO be removed from his rating chain and she was, but he apparently received lower marks on his 2014 EER because of that incident. In addition, the record shows that the FJO had recently been removed from flight training, lacked experience for her assigned duties, and sometimes did not communicate well with the enlisted members. The record shows that their working relationship became very strained and somewhat "rebellious." Also, at some point, the applicant told his subordinates to ignore her instructions.

In June 2015, after reviewing the FJO's complaint and learning for the first time the details of the applicant's conduct on March 1, 2014, the CO documented it as an alcohol incident. The Board agrees with the PIO and the CO that the applicant's conduct on March 1, 2014, met the definition of an "alcohol incident" because there is substantial evidence that he had drunk alcohol at the Mardi Gras party and his consumption of alcohol was a significant or causative factor in his inappropriate comments to her, which were disrespectful to her as a superior commissioned officer and discrediting to the Coast Guard. The Board finds that it is extremely unlikely that any chief petty officer would make such comments to a commissioned officer whom he had known for only about two weeks unless he was under the influence of alcohol. Therefore, the applicant has not shown that the Page 7 documenting this alcohol incident, dated June 8, 2015, is either erroneous or unjust. Because it was the applicant's second alcohol incident, policy required the CO to process him for separation.

7. **February 27, 2015, Incident:** The record shows that on February 27, 2015, the applicant and a Senior Chief arrived at the applicant's house and saw the FJO charging her truck's battery with a jump pack. Before entering his house, the applicant offered to help her, and she declined. Then he brought out his battery charger and offered to help her again, and she declined a second time. At some point, when she did not respond to him, he asked her if she was ignoring him. Then he went into his house and asked the Senior Chief to come with him. By the time they returned to the driveways, the FJO was inside her own house. The applicant took the Senior Chief to her front door with him, and when the FJO opened the door, the applicant offered his help a third time. This third offer caused the FJO to get visibly upset, and she accused him of ruining her time at the unit with hostility and ruining her career. She also told him that she never wanted to borrow anything from him ever again and did not want him to offer to lend her anything ever again. The applicant later told the PIO that

he had realized that she was irritated but thought that she was irritated about her truck battery, not him.

8. **May 5, 2015, PIO's Report and Notes of Mr. W[iggin's] Interview:** The May 5, 2015, PIO's report contains at least one error. The applicant alleged that errors in the report prove that the PIO was biased against him and not impartial. The Board agrees with the applicant that there is an erroneous statement regarding how the interviews were conducted on the first page. In addition, there are differences in language between the PIO's notes of interviews and his findings, and it is not clear why the PIO referenced some of the exhibits for some of his findings. But the Board is not persuaded that the PIO was biased against the applicant. Moreover, the ASB and the FRA reviewed the entirety of the PIO's report, including the referenced exhibits, not just the PIO's findings. The record shows that the ASB and the FRA could and did review the PIO's exhibits and draw their own conclusions as they did not agree with the PIO on all points. The Board also notes that the applicant submitted incomplete copies of the PIO's report and of the ASB's report to the BCMR for review and specifically omitted statements by the lesbian E-5 and a female junior officer (not the FJO [LTJG Lloyd]).

Regarding the erroneous statement in the PIO's report, on the first page, the PIO wrote that he had made notes of his interviews in the presence of the witnesses and either had already obtained their signatures verifying the accuracy of his notes or was awaiting receipt of their signatures. At the end of this sentence, the PIO referenced the exhibit numbers for all his interview notes, including the exhibit with his notes of Mr. W's interview. Therefore, the PIO's statement on the first page erroneously ignored the fact that the interview of Mr. W was telephonic. Also, about sixteen months later, Mr. W denied to the applicant's attorney that he had been asked to sign the PIO's notes of his interview, and so it is unclear if he was. But the lack of Mr. W's signature on the PIO's notes does not cast significant doubt on their accuracy given his repeatedly professed reluctance to be involved in the investigation and his subsequent conversations with the applicant's attorney and the private investigator, as explained below.

The applicant argued that the PIO's erroneous statement about how the interviews were conducted misled the ASB and the FRA about the reliability of the PIO's notes of Mr. W's interview. However, given the statement of the male E-5 [Christopher McKibben], which the E-5 signed and verified to be accurate, the Board is not persuaded that the ASB or the FRA was misled about the nature of reliability of Mr. W's interview. The PIO's interview notes clearly show that during the male E-5's in-person interview with the PIO which began at 1025 hours on March 16, 2015,

- the E-5 told the PIO that his friend Mr. W did not want to get involved in the investigation and told the PIO that, according to Mr. W, the applicant had said that he was going to ensure that the E-5 and his wife [Britany McKibben] were transferred to separate units so that they would break up and the applicant could marry his wife;
- the PIO noted the E-5's interview ending at 1049 because at 1050 hours the E-5 called Mr. W on the PIO's behalf and asked Mr. W to answer two questions for the PIO;
- the two questions concerned whether the applicant had been intoxicated on the evening of February 16, 2015, and whether Mr. W had heard the applicant state that he was going to have the married E-5s [Christopher McKibben and Britany McKibben] transferred to different units so that he could break up their marriage and marry the female E-5, who was his subordinate;
- Mr. W agreed to answer those two questions for the PIO;
- when the PIO asked Mr. W the two questions, Mr. W did not confirm the applicant's intoxication at the bar but did confirm that he had heard the applicant say, regarding the married E-5s, "I'm gonna make sure that those two leave here this summer going to different units . . . I'm gonna make her my wife," or words to that effect; and
- Mr. W also told the PIO that he had heard the applicant say "positive" things about the female E-5 before, but on this evening, he "couldn't keep silent any longer and had to tell [his friend, the male E-5] about what [the applicant] had just said to him."

Although the applicant argued that the notes of Mr. W's statement should be considered unreliable, the applicant's own evidence, including his attorney's affidavit about what Mr. W's told her sixteen months later and the transcript of the private investigator's interview with Mr. W, actually supports the PIO's finding that Mr. W heard the applicant state of February 16, 2015, that he was going to have the married E-5s transferred to different units so that he could marry the female E-5 himself. Mr. W told the applicant's attorney that he had heard a recording of his interview, and he did not deny the accuracy of the recording. Nor did he claim that the PIO had not spoken to him and did not ask him the two questions during the recording.

In addition, according to a transcript the applicant submitted, Mr. W indicated that the applicant had ruined his own career when he had spoken to Mr. W about the married E-5s that night, as he told the applicant's private investigator that:

> all I did was tell a friend of mine what [the applicant] said about his wife in a bar one night. That's all I said. . . . So his livelihood is — is — is his own mouth. . . . Yeah, I'm just out of it because all I did was tell a friend of mine one night. He

> said something derogatory about his wife and I didn't even
> know who this guy was. But little did I know that he was in
> the coast guard with them. . . . Yeah, I guess you could say
> they were interviewed by me [sic] because, uhm, my buddy
> [the male E-5] was in the Coast Guard, and — He called me
> from the coast guard station and asked me what he had said
> and I told him. — there could have been somebody else in
> the room listening. . . . And they got my statement so that's
> all there is to it.

Although the applicant complained that the PIO failed to ask Mr. W about whether there was loud music playing at the time, whether Mr. W was intoxicated, or how well he could hear the applicant in the bar on February 16, 2015, the Board notes that the applicant's attorney and private investigator both had opportunities to ask Mr. W these questions and apparently did not or did not include his answers in their documents for the BCMR. And the applicant himself could have raised these issues when he made his unsworn statement to the ASB, even though Mr. W apparently either declined to testify or was not asked to testify by the Recorder and the applicant's own attorney.

Therefore, the Board finds that the applicant has not proven by a preponderance of the evidence that the PIO, the ASB majority, or the FRA committed an error or injustice in finding that the preponderance of the evidence showed that at a bar on February 16, 2015, the applicant told Mr. W that he was going to ensure that the married E-5s were transferred to separate units that summer so that he could marry the female E-5 (after the E-5s broke up) even though the applicant did not actually have the authority to decide where they were next transferred.

9. **Fourth PIO's Report and Page 7 Regarding Retaliation:** The applicant alleged that the PIO's August 28, 2015, report and his CO erroneously concluded that his own July 2, 2015, complaint against the FJO about an alleged "hate incident" was retaliatory for her original civil rights complaint against him. The PIO's report shows that the applicant had made derogatory comments about the FJO, but no witness stated that the applicant had said that he was filing his complaint in retaliation for the FJO's complaint. The PIO noted, however, that "one can reasonably conclude that if [the applicant's complaint filed on 2 July 2015] is found to be unsubstantiated then the motive for this claim comes into question and becomes suspect, given the timing of when the claim was submitted and the circumstances that substantiated [the FJO's] initial civil rights claim." The CO apparently agreed with this reasoning because the applicant's complaint had not been substantiated, and the CO signed a Page 7 dated October 26, 2015, which counseled the applicant about having filed a retaliatory civil rights complaint. Although the applicant claimed that the

Page 7 itself was reprisal and prohibited by the Coast Guard Civil Rights Manual, he failed to cite any chapter in that manual that prohibited the Page 7.

The applicant's complaint about a "hate incident" was unsubstantiated because the FJO's outburst on February 27, 2015, was not based on the applicant's gender but on his conduct. Therefore, and given that the alleged "hate incident" occurred on February 27, 2015, but the applicant waited until July 2, 2015-after he had been told by the command that he would be processed for separation based on his second alcohol incident, which was based on the FJO's statements to the PIO about the applicant's conduct on March 1, 2014-the Board finds that the applicant has not proven by a preponderance of the evidence that the PIO or the CO erred by concluding that the preponderance of the evidence showed that the applicant had filed his complaint on July 2, 2015, in retaliation for the FJO's original complaint. Therefore, the applicant has not shown that the Page 7 dated October 26, 2015, was erroneous or unjust or that it should not have been in the applicant's record when it was reviewed by the ASB.

10. **Third Alcohol Incident**: The applicant alleged that the Page 7 dated December 2, 2015, which documents a third alcohol incident in his record (albeit the second chronologically) was retaliatory for his having filed an Article 138 complaint against his CO. The record indicates that in preparation for the ASB, the Coast Guard ran a criminal background check on the applicant and so discovered his arrest for DUI in 2010. The applicant has not shown that it is unusual or illegal for the Coast Guard to run criminal background checks on its members who are appearing before an ASB. Moreover, both Article 20.A.4.e.3.c.(1) of the Personnel Manual in effect in 2010 and Article 1.C.5.c.(3)(a) of the Drug and Alcohol Abuse Program Manual in effect in 2015 require that a DUI offense be documented as an alcohol incident. There is no time limitation on this requirement, and the member need not have been convicted of the offense. Instead, the CO must be satisfied that the preponderance of the evidence shows that the member committed the offense. In this case, the CO had the detailed report of the sheriff's office about the arrest, and the applicant admitted that in lieu of conviction, he received probation. Therefore, the preponderance of the evidence shows that the applicant was properly arrested for DUI and but received probation in lieu of a conviction. Accordingly, the Board finds that the alcohol incident documented on a Page 7 dated December 2, 2015, was not retaliatory as it is both supported by a preponderance of the evidence and required by Coast Guard policy.

11. **Command Climate**: The Board agrees with the Coast Guard that the command climate is essentially irrelevant to the issues in this case. There is evidence that in October 2014, the command investigated LCDR L's

allegations that three members, including the applicant, had become intoxicated at a golf tournament. And LCDR L was not the only attendee who thought that the applicant might have been under the influence at the tournament. A chief warrant officer also told the PIO that he had concluded at the tournament that the applicant had been drinking based on the applicant's attitude toward him during a conversation.

There is also evidence that the command promptly investigated the FJO's allegations of sexual harassment in March 2015 and of retaliation in July 2015. Preliminary investigations are required by Coast Guard policy, however, whenever someone is suspected of a felony or files a civil rights complaint about sexual harassment or retaliation. Because the investigations were required under the circumstances, the Board finds no credible evidence that the applicant's chain of command was involved in a "witch hunt" or "attack" on the applicant. Instead, the record shows that the applicant's chain of command initiated investigations when the circumstances and policy required that they do so and then took reasonable actions based on the results of the investigations. Although the applicant complained about the MPO and the order to surrender his weapons for the duration of the MPO, he had now shown that those actions were unauthorized or unreasonable. The statements gathered by subsequent investigations show that some members of the command interpreted these investigations as a "witch hunt" or an "attack" on the applicant. But neither the DEOMI surveys nor the command climate investigation in 2016 was focused on the applicant or the FJO, and the vast majority of the statements submitted by the applicant are about other members and other unrelated issues. The applicant has not proven by a preponderance of the evidence that his discharge from the Coast Guard was a direct or indirect result of a toxic command climate or "witch hunt."

12. **FJO's Motivation**: The applicant pointed out that several members made derogatory comments about the FJO's performance, and he alleged that the FJO was motivated to file a false claim of sexual harassment because of her own poor performance. He also alleged that the command raised her OER marks because of her complaint. Although there is evidence that the FJO had not performed well and that the FJO blamed the applicant for her poor performance at that unit, the sexual harassment is not a case of "he said/she said." Other witnesses substantially confirmed the FJO's allegations about what the applicant did and said on March 1, 2014, and February 27, 2015. In addition, by the time the FJO filed her first complaint against the applicant in March 2015, she had already been non-selected for promotion twice and so by law would be discharged from active duty no later than June 30, 2015.

13. **Alleged Bias of the PIO:** The Board finds that the applicant has not proven by a preponderance of the evidence that the PIO who investigated

the FJO's original complaint (or any of the PIOs) were biased against him. First, the Board notes that the applicant did not provide any reason why the PIO would have been biased against him. The applicant did not cite any previous interactions with that PIO that would have biased him against the applicant. Second, although the PIO's report contains an erroneous statement on the first page about Mr. W's interview having been in person, this error is revealed and corrected in the PIO's notes of his interviews with Mr. W and the male E-5, which clearly show that the interview with Mr. W was telephonic. Third, given Mr. W's reluctance to participate in the investigation, the PIO's failure to follow guidance, for example, by allowing the male E-5 to initiate and be present during the telephone call, by not starting the interview with open-ended questions, and by asking Mr. W to corroborate what the male E-5 had said about what happened on February 16, 2015, is not evidence of bias against the applicant. Instead, it is evidence of the PIO's decision to accommodate a reluctant civilian witness who had already stated that he did not want to become involved in military affairs.

14. **Violation of Article 107, UCMJ, False Official Statement**: The Board finds that the applicant has not proven by a preponderance of the evidence that the ASB majority or the FRA erred in finding by a preponderance of the evidence that the applicant had made a false official statement to the PIO when he denied having told a civilian, Mr. W, at a bar on February 16, 2015, that he intended to ensure that the two married E-5s were transferred to different units that summer, instead of being co-located, so that they would break up and he could marry the female E-5. To make a false official statement, the applicant must have made an official statement or signed an official document knowing it to be false with the intent to deceive. Any statement made in the line of duty is an "official statement" for the purposes of Article 107. For the ASB to conclude that the applicant's denial constituted a false official statement, the ASB had to find that the preponderance of the evidence showed that the applicant made the alleged statement about the E-5s to Mr. W and that the applicant knowingly falsely denied to the PIO that he had made the statement to Mr. W with the intent to deceive the PIO.

While the evidence is not as strong as it could be, the Board finds that the CO and the ASB reasonably concluded that the preponderance of the evidence showed that the elements of an Article 107 violation had been met. As explained in finding 8 above, the applicant has not proven by a preponderance of the evidence that Mr. W misheard what the applicant said in the bar that night or that Mr. W lied when he told the E-5 and later the PIO what the applicant had said. Instead, the preponderance of the evidence shows that the applicant actually made the alleged statement about separating the married E-5s and marrying the female E-5 to Mr. W, although the applicant denied it when confronted by the E-5 two days

later. In addition, the record shows that even after being officially warned by the PIO that he was suspected of having made a false official statement by denying having made the comment to Mr. W, the applicant again falsely denied having made the comment.

According to the ASB and FRA, they also relied on other statements in the record indicating that the applicant had made other inappropriate comments about this married female E-5. The applicant complained that there is no other evidence of inappropriate comments about the female E-5, and it is not clear what statements the ASB and the FRA referring to. However, Mr. W told the PIO that the applicant had previously made "positive" comments about the female E-5 and that after hearing the comment about separating her from her husband, he "couldn't keep silent any longer and had to tell his friend, the male E-5. In addition, the applicant did not submit some of the witness statements in the PIO's and ASB's reports, particularly those of the lesbian E-5 and another female junior officer.

During the ASB, the applicant opted to make an unsworn statement to that board. He knew the contents of the PIO's notes and could have told the ASB about any circumstances that might have made Mr. W mishear what the applicant had said. The ASB had the opportunity to listen to the applicant's claims about the alleged false official statement and assess their veracity. Therefore, the BCMR is not persuaded that the ASB majority or the FRA were misled about the nature and reliability of the evidence when they decided that the preponderance of the evidence showed that the applicant had violated Article 107, UCMJ.

(emphasis and omissions in original; final seven alterations in original; footnotes omitted).

The BCMR separately addressed "Violation of Article 89, UCMJ, Disrespect of a Superior Command Officer," "Alcohol Abuse as Basis for Separation," "Offensive Work Environment," and the "FRA's Final Action: General Discharge Without Retirement." (capitalization in original). After addressing all of plaintiff's arguments, the BCMR concluded:

Based on the findings above, the Board further finds that the applicant has not shown that the FRA erred or committed an injustice in concurring with the ASB majority's written recommendation that the applicant should receive a General discharge without retirement because of his false official statement, disrespect of a superior commissioned officer, repeated alcohol incidents, and frequent inappropriate and harassing conduct with female members, despite his nearly 19 years of service. The applicant has not proven by a preponderance of the evidence that the FRA's decision was based on fraudulent or unreliable evidence or a misunderstanding of the

ASB's report, or that it was the product of a toxic command climate, a "witch hunt," or bias on the part of the PIO. Accordingly, the applicant has not proven by a preponderance of the evidence that his General discharge for misconduct without retirement in September 2016 was erroneous or unjust.

The BCMR noted: "This final decision, dated April 15, 2022, is approved and signed by the three duly appointed members who were designated to serve as the Board in this case."[9]

After the BCMR issued its decision, on September 15, 2022, plaintiff filed his complaint in the United States Court of Federal Claims. As noted above, plaintiff alleges in his complaint:

Plaintiff petitioned the Department of Homeland Security's Board for Correction of Military Records ("Board") for correction of his erroneous and unjust discharge. Of course, in rendering its decision, the Board recognized that the investigation was riddled with errors, yet it still denied Plainitff's [sic] petition. Plaintiff now seeks relief from this Court with a review of the Board's decision.

(alteration added).

According to plaintiff: "The Board relied on this falsified Report [Lieutenant Newcomb's May 5, 2015 Preliminary Inquiry Officer Report] in finding a basis for and recommending separation from the USCG; the USCG in turn relied on this erroneous finding and recommendation," and "[t]he Board disregarded material, and relied upon erroneous, evidence in denying Plaintiff's petition." (alterations added). Therefore, plaintiff argues that the "Board's denial was arbitrary, capricious, and unsupported by evidence," and similarly, the "ASB's decision was arbitrary, capricious, and unsupported by evidence." In his complaint, plaintiff requests the following relief:

---

[9] The April 15, 2022 BCMR decision also explained:

The applicant made numerous allegations and arguments with respect to the actions and attitudes of various officers involved in his discharge. For example, he made allegations about Privacy Act and FOIA violations and the command's imposition of an MPO and orders to surrender his weapons and abstain from alcohol. Those allegations and arguments not addressed above are considered to be not dispositive of the issue of whether the applicant's record should be corrected to reflect retirement with an Honorable character of service. In particular, the legal remedies for violations of the Privacy Act and FOIA do not include awards of constructive service and retired pay.

(alterations added; footnote omitted).

1. Find the Board's decision was based on material error that was not harmless;

2. Because the ASB was also based on the same erroneous PIO report, find the ASB's decision was based on material error that was not harmless;

3. Direct the Board's decision be set aside;

4. Direct the ASB's decision be set aside;

5. Remand the matter to the Board to correct Plaintiff's record to reflect retirement upon 20 years of service;

6. Provide appropriate backpay;

7. Provide compensation for attorney's fees under the Equal Access to Justice Act; and

8. Provide such other relief as may be deemed necessary or appropriate in order to accord full and complete relief.

After the Administrative Record was filed in the above captioned case, plaintiff file a motion for judgment on the Administrative Record. Plaintiff's motion for judgment on the Administrative Record begins:

As a small service, the United States Coast Guard ("USCG") has a history of ostracizing those it deems no longer fit within its self-described culture. Once the individual becomes ostracized, the USCG engages in a concerted effort to rid the USCG of the member, often times through the use of biased and incorrect administrative investigations. Mr. Reinhard was one such victim of this concerted ostracization. In 2015, Mr. Reinhard's command appointed an investigation to find any possible incriminating evidence against him. The investigation's final report was riddled with errors yet became the government's sole piece of evidence against him in a subsequent ASB. Because of this erroneous report of investigation, Mr. Reinhard was discharged from the USCG with a General Under Honorable Conditions discharge approximately one year shy of retirement. Mr. Reinhard petitioned the BCMR for correction of his erroneous and unjust discharge. The BCMR is statutorily required to correct records containing errors or injustices. Of course, in rendering its decision, the Board recognized that the investigation was riddled with errors, yet it failed in fulfilling its correction mandate by denying Mr. Reinhard's petition. Not only did the BCMR fail to correct an error it so blatantly recognized existed, but it conducted a post hoc rationalization of the evidence in the investigative report to justify its denial.

Plaintiff frames the issues in the case a "toxic command climate, witch hunt of Mr. Reinhard, and falsified investigation." Plaintiff argues:

> The BCMR is required to grant relief where there is a blatant error or injustice present in the matter. Through multiple examples of the toxic climate, post-ASB interviews, and blatant errors contained in the PIO's report, Mr. Reinhard demonstrated the erroneous report of investigation was relied upon by the ASB, resulting in error and injustice. The ASB was presented with false and misleading hearsay information bolstered by the assertions of a commissioned officer who did not even testify at the hearing. The BCMR ignored the crux of undersigned counsel's affidavit and the private investigator's interview which shows the PIO did not interview Mr. Wiggins and he was threatened with making a statement contrary to what the Coast Guard put forth in the PIO's report. The BCMR disregarded the post-ASB affidavits exposure of the falsifications within the PIO's report. Rather, the BCMR plucked certain information out from counsel's affidavit and private investigator's interview to affirm the ASB majority and FRA's erroneous decisions to substantiate the alleged Article 107 violation. The post-ASB statements reveal the extent of the error and injustice from the results of the ASB. Mr. Wiggin's [sic] alleged statement reflected in the PIO's report lacks credibility, and the post-ASB interviews in no way support the PIO's finding that Mr. Wiggins heard Mr. Reinhard say that he was going to have the McKibbens transferred to different units so he could marry MST2 Brittany McKibben. For the USCG to permit one its Chief Petty Officer's to be separated without retirement based on such suspect evidence presented to a panel of members reaches an appalling level of injustice.

(alteration added).

Consistent with the complaint, plaintiff argues in his motion for judgment on the Administrative Record that the "Board's decision to deny Mr. Reinhard's petition to correct his military record was arbitrary, capricious, and unsupported by evidence. The error was not harmless." Plaintiff contends:

> The issue in this case is very simple and straightforward: the PIO erred in issuing his report; this erroneous report was relied upon by the ASB and FRA in separating Mr. Reinhard; the BCMR admitted the errors existed; and yet, the BCMR upheld Mr. Reinhard's erroneous discharge by attempting to rationalize Mr. Wiggins' supposed statements to LT Newcomb with post-ASB affidavits of counsel and the private investigator. In doing so, the BCMR disregards pertinent facts present in the petition. The BCMR cannot remain blind to facts supportive of Mr. Reinhard's petition, nor can it create its own rationalization supporting separation that

was not previously before the ASB or FRA. The BCMR did both, thereby rendering its decision arbitrary, capricious, and unsupported by evidence.

In its cross-motion for judgment on the Administrative Record, defendant contends that the "BCMR's Article 107 finding is supported by substantial evidence." Defendant argues that "[s]ubstantial record evidence supports the BCMR's finding that Mr. Reinhard lied to the Coast Guard about his comments to Mr. Wiggins at The Drink House. This evidence includes witness statements from Mr. Wiggns [sic], Mr. McKibben, Mrs. McKibben, and others." (alterations added). Defendant contends that "[a]ll of Mr. Reinhard's arguments ask this Court to reweigh conflicting evidence and reassess the credibility of witness statements to the Coast Guard." (alteration added).

In his reply brief, plaintiff argues that "[t]he BCMR's Decision to uphold the Article 107 finding is not supported by substantial evidence because self-contradictions, omissions in a purportedly complete account, imprecision, and errors detract from the weight of the sole piece of evidence used to separate Mr. Reinhard." (alteration added). Defendant, in its reply brief, argues that "Mr. Reinhard has failed to demonstrate any legal error In the BMCR Decision." After the cross-motions for judgment on the Administrative Record were fully briefed, the court held oral argument.


# D I S C U S S I O N

As indicated above, the parties have cross-moved for judgment on the Administrative Record. Rule 52.1(c)(1) of the Rules of the United States Court of Federal Claims (2023) governs motions for judgment on the Administrative Record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record.'" Harmonia Holdings Grp., LLC v. United States, 20 F.4th 759, 766 (Fed. Cir. 2021) (quoting XOtech, LLC v. United States, 950 F.3d 1376, 1379 (Fed. Cir. 2020)); see also Stahl v. United States, 167 Fed. Cl. 657, 680 (2023); Henrikson v. United States, 162 Fed. Cl. 594, 607 (2022); Raj v. United States, 158 Fed. Cl. 569, 571 (2022); Valles-Prieto v. United States, 159 Fed. Cl. 611, 616 (2022) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006)); Superior Optical Labs, Inc. v. United States, 150 Fed. Cl. 681, 691 (2020) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356–57 (Fed. Cir. 2005)); AAR Manufacturing, Inc. v. United States, 149 Fed. Cl. 514, 522 (2020); Glocoms, Inc. v. United States, 149 Fed. Cl. 725, 731 (2020); Centerra Grp., LLC v. United States, 138 Fed. Cl. 407, 412 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1356–57); Informatics Applications Grp., Inc. v. United States, 132 Fed. Cl. 519, 524 (2017) (citation omitted); Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016); Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126 at 131). The process is "designed to provide for trial on a paper record, allowing fact-finding by the trial court." Bannum, Inc. v. United States, 404 F.3d at 1356; see also Raj v. United States, 158 Fed. Cl. at

571; Vectrus Sys. Corp. v. United States, 154 Fed. Cl. 29, 40 (2021); Jordan Pond Col, LLC v. United States, 115 Fed. Cl. 623, 630 (2014).

The court reviews the April 15, 2022 BCMR decision as to whether the decision was arbitrary, capricious, unsupported by substantial evidence, or contrary to law. Chappell v. Wallace, 462 U.S. 296, 303 (1983) ("Board decisions are subject to judicial review and can be set aside if they are arbitrary, capricious or not based on substantial evidence"). The Court of Appeals for the Federal Circuit has written, "we will not disturb the decision of the Board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence." Prestonback v. United States, 965 F.3d 1363, 1368 (Fed. Cir. 2020) (citing Chambers v. United States, 417 F.3d 1218, 1227 (Fed. Cir. 2005) (citing Haselrig v. United States, 333 F.3d 1354, 1355 (Fed. Cir. 2003))); see also Doyon v. United States, 58 F.4th 1235, 1242 (Fed. Cir. 2023) ("[A] court may only set aside the BCNR's [Board for Correction of Naval Records] decision if it was 'arbitrary or capricious, unsupported by substantial evidence, or otherwise not in accordance with law'" (alterations added) (quoting Fisher v. United States, 402 F.3d at 1180)); Baude v. United States, 955 F.3d at 1298; Barnick v. United States, 591 F.3d 1372, 1377 (Fed. Cir. 2010); Lewis v. United States, 458 F.3d 1372, 1376 (Fed. Cir.) (citing Martinez v. United States, 333 F.3d 1305, 1314), reh'g en banc denied (Fed. Cir. 2006), cert. denied, 552 U.S. 810 (2007) (stating that this court reviews the AFBCMR decision "to determine whether it is arbitrary, capricious, unsupported by substantial evidence, or contrary to law"); Metz v. United States, 466 F.3d 991, 998 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2006); Porter v. United States, 163 F.3d 1304, 1312 (Fed. Cir. 1998), reh'g denied, en banc suggestion declined (Fed. Cir.), cert. denied, 528 U.S. 809 (1999); Heisig v. United States, 719 F.2d at 1156; Skinner v. United States, 219 Ct. Cl. 322, 332, 594 F.2d 824, 830 (1979); Henrikson v. United States, 162 Fed. Cl. at 607 ("As noted, the scope of review of the decision of a military correction board is a narrow and deferential one. The Court is '"limited to determining whether a decision of the Correction Board is arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations."'" (quoting Melendez Camilo v. United States, 642 F.3d 1040, 1044 (Fed. Cir. 2011) (quoting Heisig v. United States, 719 F.2d at 1156))); Osburn v. United States, No. 22-1689C, 2024 WL 1794173, at *4 (Fed. Cl. Apr. 25, 2024); Okuda v. United States, 160 Fed. Cl. 549, 559 (2022); Ward v. United States, 133 Fed. Cl. 418, 427 (2017); Joslyn v. United States, 110 Fed. Cl. 372, 389 (2013); Meidl v. United States, 108 Fed. Cl. 570, 575 (2013). This standard of review is narrow. The court does not sit as "a 'super correction board.'" King v. United States, 149 Fed. Cl. 272, 275 (2020) (citing Skinner v. United States, 219 Ct. Cl. at 331, 594 F.2d at 830). Moreover, "military administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs." Dodson v. United States, 988 F.2d 1199, 1204 (Fed. Cir. 1993); Stahl v. United States, 167 Fed. Cl. at 674.

In Verbeck v. United States, a Judge of this court stated:

The court's review in these matters is thus limited in scope and deferential in nature. Ms. Verbeck must show that the Board's decision was arbitrary

and capricious, contrary to law, or unsupported by substantial evidence. See Chambers v. United States, 417 F.3d at 1227 [cert. denied, 546 U.S. 1066 (2005)]; Godwin v. United States, 338 F.3d 1374, 1378 (Fed. Cir. 2003); Heisig [v. United States], 719 F.2d [at 1156] . . . . The Board's decision will comply with the substantial evidence standard so long as a "'reasonable mind might accept' [the] particular evidentiary record as 'adequate to support [the contested] conclusion.'" Dickinson v. Zurko, 527 U.S. 150, 162, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999) (quoting Consolidated Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). Similarly, the arbitrary and capricious standard "requires a reviewing court to sustain an action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) [reh'g denied (Fed. Cir. 2000)].

In sum, the court must satisfy itself that the Board considered all of the relevant evidence and provided a reasoned opinion that reflects a contemplation of the facts and circumstances pertinent to the case before it. See Heisig v. United States, 719 F.2d at 1157 ("Under the substantial evidence rule, all of the competent evidence must be considered, whether original or supplemental, and whether or not it supports the challenged conclusion."); Van Cleave v. United States, 70 Fed. Cl. 674, 678–79 (2006) (While the court does not "serve as a 'super correction board[,]' Skinner v. United States, . . . correction boards must examine relevant data and articulate satisfactory explanations for their decisions.") (citations omitted). If the Board "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the [Board], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]" its decision runs afoul of even this lenient standard of review. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983).

Verbeck v. United States, 97 Fed. Cl. 443, 451 (2011) (emphasis in original; third and fourth omission in original); see also Stahl v. United States, 167 Fed. Cl. at 668. A Judge of this court recently noted, in reviewing a BCMR decision for a member of the Coast Guard who was separated, for among other reason, making false official statements under Article 107 of the UCMJ, the "Board is not required to detail its assessment of every piece of evidence in the record, nor resemble 'a model of analytic precision to survive a challenge.'" Osburn v. United States, 2024 WL 1794173, at *5 (quoting Dickson v. Sec'y of Def., 68 F.3d 1396, 1404 (D.C. Cir. 1995)).

"For the motion for judgment on the administrative record, plaintiff bears the burden to prove through the administrative record the Board's decision was arbitrary and capricious, contrary to law, or unsupported by substantial evidence." Stahl v. United States, 167 Fed. Cl. at 673 (citing Chambers v. United States, 417 F.3d at 1227; see

also Arens v. United States, 969 F.2d 1034, 1037 (Fed. Cir. 1992). A Judge of this court recently explained

> in challenging the determinations of a military corrections board, a plaintiff must demonstrate "by cogent and clearly convincing evidence," id. [Roth v. United States, 378 F.3d 1371, 1381 (Fed. Cir. 2004)] (quoting Dorl v. United States, 200 Ct. Cl. 626, 633 (1973)), the military board's decision was "arbitrary, capricious, unsupported by substantial evidence, or contrary to law." Id. at 1576. It is well settled "responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province; and that courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983) (citations omitted).

Stahl v. United States, 167 Fed. Cl. at 673–74 (alteration added).

In plaintiff's motion for judgment on the Administrative Record, plaintiff first argues that the "BCMR disregarded the substantial evidence showing the lack of veracity of the PIO's [Lieutenant Newcomb's] report." (alteration added). Plaintiff argues:

> LT [Lieutenant] Newcomb lied about: (1) how he contacted Mr. Wiggins; (2) whether Mr. Wiggins knew of his (Newcomb's notes); (3) whether Mr. Wiggins reviewed the notes; (4) whether Mr. Wiggins verified the accuracy of the notes; and (5) whether the contact with Mr. Wiggins was even an "interview" in the first place. The fact that LT [Lieutenant] Newcomb **lied** about each one of these instances is proof positive that his report, especially as it pertains to the Article 107 violation, **is not credible**. More shockingly, the BCMR admits that LT Newcomb's report erred in these respects.

(emphasis in original).

The BCMR's decision, however, directly addressed plaintiff's concerns about errors in Lieutenant Newcomb's May 5, 2015 Preliminary Inquiry Officer Report. The BCMR acknowledged:

> The May 5, 2015, PIO's report contains at least one error. The applicant alleged that errors in the report prove that the PIO was biased against him and not impartial. The Board agrees with the applicant that there is an erroneous statement regarding how the interviews were conducted on the first page. In addition, there are differences in language between the PIO's notes of interviews and his findings, and it is not clear why the PIO referenced some of the exhibits for some of his findings.

The BCMR continued:

> Regarding the erroneous statement in the PIO's report, on the first page, the PIO wrote that he had made notes of his interviews in the presence of the witnesses and either had already obtained their signatures verifying the accuracy of his notes or was awaiting receipt of their signatures. At the end of this sentence, the PIO referenced the exhibit numbers for all his interview notes, including the exhibit with his notes of Mr. W's interview. Therefore, the PIO's statement on the first page erroneously ignored the fact that the interview of Mr. W was telephonic. Also, about sixteen months later, Mr. W denied to the applicant's attorney that he had been asked to sign the PIO's notes of his interview, and so it is unclear if he was.

The BCMR added a footnote at the end of the above quotation:

> The Board notes that according to the applicant's attorney, Mr. W originally denied having been interviewed at all but later admitted to having recently heard a recording of his interview with the PIO and then told her that he could not recall whether the recording showed that he knew he was talking to the PIO or knew that the call was being recorded but did not claim that only he [Mr. Wiggins] and the E-5 spoke during the recording.

(alteration added). The BCMR determined, however,

> [b]ut the lack of Mr. W's signature on the PIO's notes does not cast significant doubt on their accuracy given his repeatedly professed reluctance to be involved in the investigation and his subsequent conversations with the applicant's attorney and the private investigator, as explained below. The applicant argued that the PIO's erroneous statement about how the interviews were conducted misled the ASB and the FRA about the reliability of the PIO's notes of Mr. W's interview. However, given the statement of the male E-5, which the E-5 signed and verified to be accurate, the Board is not persuaded that the ASB or the FRA was misled about the nature of reliability of Mr. W's interview.

(alteration added). The BCMR also noted:

> Moreover, the ASB and the FRA reviewed the entirety of the PIO's report, including the referenced exhibits, not just the PIO's findings. The record shows that the ASB and the FRA could and did review the PIO's exhibits and draw their own conclusions as they did not agree with the PIO on all points. The Board also notes that the applicant submitted incomplete copies of the PIO's report and of the ASB's report to the BCMR for review and specifically omitted statements by the lesbian E-5 and a female junior officer (not the FJO).

As noted above, plaintiff argues that because of the errors addressed above, Lieutenant Newcomb, and therefore, Lieutenant Newcomb's May 5, 2015 Preliminary Inquiry Officer Report "*is not credible*." (emphasis in original). The BCMR explained, however,

> [t]he PIO's interview notes clearly show that during the male E-5's in-person interview with the PIO which began at 1025 hours on March 16, 2015,
>
> - the E-5 told the PIO that his friend Mr. W did not want to get involved in the investigation and told the PIO that, according to Mr. W, the applicant had said that he was going to ensure that the E-5 and his wife were transferred to separate units so that they would break up and the applicant [MSTC Reinhard] could marry his wife;
> - the PIO noted the E-5's interview ending at 1049 because at 1050 hours the E-5 called Mr. W on the PIO's behalf and asked Mr. W to answer two questions for the PIO;
> - the two questions concerned whether the applicant had been intoxicated on the evening of February 16, 2015, and whether Mr. W had heard the applicant state that he was going to have the married E-5s transferred to different units so that he could break up their marriage and marry the female E-5, who was his subordinate;
> - Mr. W agreed to answer those two questions for the PIO;
> - when the PIO asked Mr. W the two questions, Mr. W did not confirm the applicant's intoxication at the bar but did confirm that he had heard the applicant say, regarding the married E-5s, "I'm gonna make sure that those two leave here this summer going to different units . . . I'm gonna make her my wife," or words to that effect; and
> - Mr. W also told the PIO that he had heard the applicant say "positive" things about the female E-5 before, but on this evening, he "couldn't keep silent any longer and had to tell about what [the applicant] had just said to him."

(first alteration added).

The quotations from Lieutenant Newcomb's notes are supported by the sworn statements of Britany McKibben and Christopher McKibben, included as exhibits to Lieutenant Newcomb's May 5, 2015 Preliminary Inquiry Officer Report. Britany McKibben statement included:

> - Ronnie [Wiggins] pulled Chris [McKibben] aside outside the Drink House (Morgan City), said that he was concerned because MSTC [Reinhard] had made numerous inappropriate comments about

39

MST2 Britany McKibben to Ronnie. Ronnie told Chris, he [MSTC
Reinhard] stated "He is going to make sure that Chris and Britany
[McKibben] are not going to be stationed together following this
summer's transfer: and that MSTC is going to make MST2 Britany
McKibben his wife." She did not know if MSTC had been drinking at
the time that he made that statement to Ronnie.

- Chris told Britany on the way home what he had heard from Ronnie
  that MSTC had said about her and them.

(alterations added). Christopher McKibben's sworn statement, which was also included
as an exhibit to Lieutenant Newcomb's May 5, 2015 Preliminary Inquiry Officer Report,
stated:

- Described incident at Drink House on Lundi Gras 2015 Similar to
  MST2 Britany McKibben.
- Spoke w/ Ronnie Wiggins outside of the bar.
- Described how MSTC [Reinhard] had told Ronnie that he [MSTC
  Reinhard] was going to make sure that the McKibben's [sic] would
  be transferring to different units this summer and that MSTC would
  make MST2 Britany McKibben his wife.
- Told Britany about it after they'd already left the bar because he
  didn't want to ruin her night or start a confrontation.
- Mentioned that Ronnie was apprehensive about speaking to the
  USCG about this case because he didn't want to get involved.

(alterations added).

Separately, plaintiff also argues that the statements made by Mr. Wiggins to
Christopher McKibben were unreliable. Plaintiff contends that

the supposed statement made to MST2 Christopher McKibben,
supposedly in the PIO's presence, is unreliable because Mr. Wiggins,
contrary to his statements in the PIO's notes, did not know who Mr.
Reinhard was or whether he was even connected to the Coast Guard.
Thus, it is completely plausible that what he supposedly heard Mr.
Reinhard say was taken out of context. Indeed, there is no indication in
the PIO's notes that Mr. Wiggins asked what his and Mr. Reinhard's
overall conversation was about, and [sic]

(alteration added). The BCMR addressed plaintiff's concern in its decision, explaining:

Although the applicant argued that the notes of Mr. W's statement should
be considered unreliable, the applicant's own evidence, including his
attorney's affidavit about what Mr. W told her sixteen months later and the
transcript of the private investigator's interview with Mr. W, actually
supports the PIO's finding that Mr. W heard the applicant state of February
16, 2015, that he was going to have the married E-5s transferred to
different units so that he could marry the female E-5 himself. Mr. W told

the applicant's attorney that he had heard a recording of his interview, and he did not deny the accuracy of the recording. Nor did he claim that the PIO had not spoken to him and did not ask him the two questions during the recording.

The BCMR continued:

In addition, according to a transcript the applicant submitted, Mr. W indicated that the applicant had ruined his own career when he had spoken to Mr. W about the married E-5s that night, as he told the applicant's private investigator that:

> all I did was tell a friend of mine what [the applicant] said about his wife in a bar one night. That's all I said. . . . So his livelihood is — is — is his own mouth. . . . Yeah, I'm just out of it because all I did was tell a friend of mine one night. He said something derogatory about his wife and I didn't even know who this guy was. But little did I know that he was in the coast guard with them. . . . Yeah, I guess you could say they were interviewed by me [sic] because, uhm, my buddy [Christopher McKibben] was in the Coast Guard, and — He called me from the coast guard station and asked me what he had said and I told him. — there could have been somebody else in the room listening. . . . And they got my statement so that's all there is to it.

(first alteration in original; omissions in original). The BCMR also noted:

> Although the applicant complained that the PIO failed to ask Mr. W about whether there was loud music playing at the time, whether Mr. W was intoxicated, or how well he could hear the applicant in the bar on February 16, 2015, the Board notes that the applicant's attorney and private investigator both had opportunities to ask Mr. W these questions and apparently did not or did not include his answers in their documents for the BCMR. And the applicant himself could have raised these issues when he made his unsworn statement to the ASB, even though Mr. W apparently either declined to testify or was not asked to testify by the Recorder and the applicant's own attorney.

The BCMR explained:

> Therefore, the Board finds that the applicant has not proven by a preponderance of the evidence that the PIO, the ASB, or the FRA an error or injustice in finding that the preponderance of the evidence showed that at a bar on February 16, 2015, the applicant told Mr. W that he was going to ensure that the married E-5s were transferred to separate units that

summer so that he could marry the female E-5 (after the E-5s broke up) even though the applicant did not actually have the authority to decide where they were next transferred.

The BCMR reiterated the above in its conclusions regarding the "Violation of Article 107, UCMJ, False Official Statement." The BMCR determined:

> The Board finds that the applicant has not proven by a preponderance of the evidence that the ASB majority or the FRA erred in finding by a preponderance of the evidence that the applicant had made a false official statement to the PIO when he denied having told a civilian, Mr. W, at a bar on February 16, 2015, that he intended to ensure that the two married E-5s were transferred to different units that summer, instead of being co-located, so that they would break up and he could marry the female E-5. To make a false official statement, the applicant must have made an official statement or signed an official document knowing it to be false with the intent to deceive. Any statement made in the line of duty is an "official statement" for the purposes of Article 107. For the ASB to conclude that the applicant's denial constituted a false official statement, the ASB had to find that the preponderance of the evidence showed that the applicant made the alleged statement about the E-5s to Mr. W and that the applicant knowingly falsely denied to the PIO that he had made the statement to Mr. W with the intent to deceive the PIO.

> While the evidence is not as strong as it could be, the Board finds that the CO and the ASB reasonably concluded that the preponderance of the evidence showed that the elements of an Article 107 violation had been met. As explained in finding 8 above, the applicant has not proven by a preponderance of the evidence that Mr. W misheard what the applicant said in the bar that night or that Mr. W lied when he told the E-5 and later the PIO what the applicant had said. Instead, the preponderance of the evidence shows that the applicant actually made the alleged statement about separating the married E-5s and marrying the female E-5 to Mr. W, although the applicant denied it when confronted by the E-5 two days later. In addition, the record shows that even after being officially warned by the PIO that he was suspected of having made a false official statement by denying having made the comment to Mr. W, the applicant again falsely denied having made the comment.

> According to the ASB and FRA, they also relied on other statements in the record indicating that the applicant had made other inappropriate comments about this married female E-5. The applicant complained that there is no other evidence of inappropriate comments about the female E-5, and it is not clear what statements the ASB and the FRA are referring to. However, Mr. W told the PIO that the applicant had previously made "positive" comments about the female E-5 and that after hearing the

comment about separating her from her husband, he "couldn't keep silent any longer and had to tell his friend, the male E-5. In addition, the applicant did not submit some of the witness statements in the PIO's and ASB's reports, particularly those of the lesbian E-5 and another female junior officer.

During the ASB, the applicant opted to make an unsworn statement to that board. He knew the contents of the PIO's notes and could have told the ASB about any circumstances that might have made Mr. W mishear what the applicant had said. The ASB had the opportunity to listen to the applicant's claims about the alleged false official statement and assess their veracity. Therefore, the BCMR is not persuaded that the ASB majority or the FRA were misled about the nature and reliability of the evidence when they decided that the preponderance of the evidence showed that the applicant had violated Article 107, UCMJ.

(emphasis in original; footnote omitted).

The court finds that the Administrative Separation Board, the Final Reviewing Authority, and the BCMR each weighed the conflicting statements about whether plaintiff told Mr. Wiggins that he that he planned to ensure that the Christopher McKibben and Britany McKibben were transferred to different units, so that the McKibbens would break up and plaintiff could marry Britany McKibben. Although plaintiff is frustrated with how each level of the review process weighed the conflicting evidence and the credibility of the witnesses and Lieutenant Newcomb, who plaintiff maintains "**is not credible**," "courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." Heisig v. United States, 719 F.2d at 1156; see also Stahl v. United States, 167 Fed. Cl. at 673-74. The court finds that it was reasonable for the Administrative Separation Board, the Final Reviewing Authority, and the BCMR to each find that plaintiff violated Article 107 of the UCMJ. The BCMR not only reviewed all of the evidence in the record before the BCMR to come to its conclusions, but also determined that "the CO and the ASB reasonably concluded that the preponderance of the evidence showed that the elements of an Article 107 violation had been met." The BCMR explained that

the ASB and the FRA reviewed the entirety of the PIO's report, including the referenced exhibits, not just the PIO's findings. The record shows that the ASB and the FRA could and did review the PIO's exhibits and draw their own conclusions as they did not agree with the PIO on all points. The Board also notes that the applicant submitted incomplete copies of the PIO's report and of the ASB's report to the BCMR for review and specifically omitted statements by the lesbian E-5 and a female junior officer (not the FJO).

Plaintiff has not been able to prove that the April 15, 2022 BCMR decision regarding a violation Article 107 of the UCMJ was "arbitrary or capricious, unsupported by substantial evidence, or otherwise not in accordance with law." Doyon v. United States, 58 F.4th at 1242; see also Barnick v. United States, 591 F.3d at 1377; Prestonback v. United States, 965 F.3d at 1368; Chambers v. United States, 417 F.3d at 1227.[10]

---

[10] The court notes that plaintiff only challenges the April 15, 2022 BCMR decision with respect to the determination that plaintiff had made a false official statement to the PIO, and therefore, violated Article 107 of the UCMJ. The court notes, however, the BCMR separately addressed "Violation of Article 89, UCMJ, Disrespect of a Superior Command Officer," "Alcohol Abuse as Basis for Separation," "Offensive Work Environment," and the "FRA's Final Action: General Discharge Without Retirement." (capitalization in original). After addressing all of plaintiff's arguments, the BCMR concluded:

> Based on the findings above, the Board further finds that the applicant has not shown that the FRA erred or committed an injustice in concurring with the ASB majority's written recommendation that the applicant should receive a General discharge without retirement because of his false official statement, disrespect of a superior commissioned officer, repeated alcohol incidents, and frequent inappropriate and harassing conduct with female members, despite his nearly 19 years of service. The applicant has not proven by a preponderance of the evidence that the FRA's decision was based on fraudulent or unreliable evidence or a misunderstanding of the ASB's report, or that it was the product of a toxic command climate, a "witch hunt," or bias on the part of the PIO. Accordingly, the applicant has not proven by a preponderance of the evidence that his General discharge for misconduct without retirement in September 2016 was erroneous or unjust.

Additionally, the Final Reviewing Authority provided additional insight regarding plaintiff's discharge from the military. As reflected in an affidavit submitted by the Final Reviewing Authority in plaintiff's case filed in the United States District Court for the District of Columbia, and included in the Administrative Record in the above captioned case, the Final Reviewing Authority affirmed:

> After carefully reviewing the Administrative Record, I approved the Record, Findings of Fact, Opinions, and Recommendations of the Administrative Separation Board, and directed that MSTC be separated from the Coast Guard, with a General Discharge, for Misconduct due to Commission of a Serious Offense. I made this decision because a majority of the Board recommended this outcome, after finding that MSTC Reinhard violated both Article 89 and Article 107 of the Uniform Code of Military Justice (UCMJ). I also personally believe based on my review of the record that he committed the offenses.

Separately, plaintiff argues "[t]he BCMR's decision is nothing more than a post hoc rationalization." (alteration added). Plaintiff argues that "[a] post hoc rationalization by the BCMR cannot cure an otherwise erroneous separation process. The only remedy is for the Board to order a new separation process." (alteration added). For support, plaintiff tries to cite the decision of the United States Court of Appeals for the Federal Circuit in Dodson v. United States, 988 F.2d 1199. Plaintiff quotes Dodson for the following proposition:

> "Nor will a post hoc advisory opinion given by a MILPERCEN administrator to the ABCMR cure an otherwise erroneous selection decision. The ABCMR may potentially 'remedy' an error which it has found to have occurred in a selection decision by ordering a new selection board convened to make the decision de novo. However, a simple advisory opinion by MILPERCEN does not 'undertake the exhaustive reevaluation that normal, regular section board does.'" (internal citations omitted)).

---

The Final Reviewing Authority continued:

> In this case, I was not required to take action contrary to the Administrative Separation Board because a majority of the Members of the Board recommended separation. However, if this Administrative Separation Board had been unanimous in the opinion that MSTC Reinhard did not violate Article 107 of the UCMJ, I would have taken action contrary to the recommendation of the Board, and ordered that MSTC Reinhard be separated from the Coast Guard, with a General Discharge. I would have taken this action because the Board found that, regardless of the basis for separation, there was not a reasonable prospect for rehabilitation. In addition, as I noted in the Action of the Final Reviewing Authority, the record clearly indicates that MSTC Reinhard created an offensive environment for three female workers, engaged in retaliation, and failed to learn from verbal counseling that was designed to correct his harassing behavior.

> I am aware of the allegation that one witness statement, from Mr. Ronnie Wiggins, was not accurate. However, I reviewed the Administrative Record for this case, in light of that allegation, and concluded that I would have ordered that MSTC Reinhard be separated from the Coast Guard, with a General Discharge, even if this allegation was true. This is because, as noted above, the Administrative Separation Board found multiple bases in Coast Guard policy which supported a decision to separate MSTC Reinhard. Even if MSTC Reinhard did not make a false statement, in violation of Article 107 of the UCMJ, the evidence in the record supports a decision that he should be separated, with a General Discharge.

(quoting Dodson v. United States, 988 F.2d at 1206). Regarding the plaintiff's reliance on Dodson, the facts in the above captioned case differ dramatically from the facts in Dodson. In Dodson, "[a]s of April 1982, Dodson was an E–6 Staff Sergeant in the United States Army, 25th Infantry Division, Hawaii." Id. at 1201 (alteration added). The Federal Circuit explained:

> Pursuant to the Army's Qualitative Management Program (QMP), Dodson received his eighth annual enlisted evaluation report (EER) for the period May 1981 to April 1982, scoring 124 (EER 124) out of a maximum 125, the average score being 121. The QMP is used by the Army to screen enlisted soldiers' Official Military Personnel Files (OMPFs) to "[s]electively retain the best qualified soldiers" and "[d]eny reenlistment to [those who are] nonprogressive and nonproductive." Army Reg. 600–200, paras. 4–1, 4–2 (1982). Under the program the OMPFs of E–6 personnel, such as Dodson, are submitted to a regularly scheduled Promotion Selection Board. Army Reg. 600–200, para. 4–11.a. "From the OMPF, the board will evaluate past performances and estimate the potential of each soldier to determine if continued service is warranted." Army Reg. 600–200, para. 4–11.b (emphasis added).

> Sometime after receiving his EER, Dodson learned that a substitute rater mistakenly placed an EER 110 into Dodson's OMPF. Dodson's file, including the incorrect EER, was forwarded to the Promotion Selection Board for evaluation. When Dodson's EER 124 was later discovered at the base, a personnel officer attempted to have the EER 110 returned and the EER 124 substituted, but was informed that Dodson had to appeal the EER to the EER Appeal Board, which Dodson did.

> On March 29, 1983, the Promotion Selection Board barred Dodson from reenlisting. In its letter of notification to Dodson, the board identified as the "basis" for the bar eight EERs, dating from Dodson's first in December 1975 to his last, which was the erroneous one of April 1982, and a 1966 nonjudicial punishment for theft of two T-shirts.

> After the decision barring reenlistment, the EER Appeal Board in September 1983 ruled in Dodson's favor, invalidating the EER 110 and deleting it from Dodson's OMPF. The EER Appeal Board, however, did not complete Dodson's file by including his correct EER 124. Dodson then attempted to appeal his reenlistment bar directly to the Army's Military Personnel Center (MILPERCEN), which oversees the QMP. MILPERCEN returned Dodson's appeal in November 1983 and directed him to submit it through his chain of command.

> After the decision barring reenlistment, the EER Appeal Board in September 1983 ruled in Dodson's favor, invalidating the EER 110 and

deleting it from Dodson's OMPF. The EER Appeal Board, however, did not complete Dodson's file by including his correct EER 124.

Dodson then attempted to appeal his reenlistment bar directly to the Army's Military Personnel Center (MILPERCEN), which oversees the QMP. MILPERCEN returned Dodson's appeal in November 1983 and directed him to submit it through his chain of command. Dodson asserts that when he attempted to appeal through his chain of command, his commanding officer gave him a direct order to wait until April 1984, when he was to return from an upcoming assignment in Korea. In April 1984, Dodson submitted an "individual" appeal pursuant to Army Regulation 600–200, para. 4–15.a, to the Army Reenlistment Appeals Board, accompanied by recommendations from his commanders and notice of the correct EER 124. While this appeal was pending, the Army transferred Dodson, on April 16, 1984, from Hawaii to the 9th Infantry Division in Fort Lewis, Washington. Four days later, and before he left for Fort Lewis, Dodson's battalion personnel officer executed a nine month extension of Dodson's enlistment until May 19, 1985.

Dodson v. United States, 988 F.2d 1201–02 (footnotes omitted; emphasis in original). The Federal Circuit explained that "[o]n November 9, 1984, the Reenlistment Appeals Board disapproved Dodson's appeal 'based on [his] marginal performance of duty as reflected by his long history of below average enlisted evaluation reports, especially in [his] current grade.'" Id. at 1202 (first alteration added). Thereafter,

[t]he Army honorably discharged Dodson on December 26, 1984, with a bar to reenlistment. Dodson again attempted to appeal the discharge and bar to MILPERCEN, but Dodson's appeal was rejected because he was no longer on active duty. MILPERCEN advised Dodson that he should appeal to the Army Board for Correction of Military Records (ABCMR).

Id. (alteration added; footnote omitted). After plaintiff Dodson's discharge,

[o]n March 12, 1985, Dodson applied to the ABCMR, requesting that it void his discharge, and retroactively restore him to active duty with an award of back pay. He asked in the alternative that his bar to reenlistment be lifted, that his EER 124 be inserted into his OMPF, and that he be allowed to seek reenlistment. Dodson asserted that his discharge was unjust and flawed by material error for several reasons. First, he contended that the Promotion Selection Board had considered an invalid EER in instituting the bar. Second, he asserted that the Army had assigned him to Fort Lewis during his bar appeal, thereby violating Army regulations as well as prejudicing his ability to adequately appeal. Third, he contended that while his commander appeals were pending the Army discharged him in violation of Army regulations. Finally, he argued that the Army discharged him before his extended ETS of May 19, 1985.

Id. (alteration added).

> The ABCMR denied the application and
>
> concluded that the "apparent administrative errors" made in processing Dodson's appeals and in transferring him were not "fatal flaws of sufficient magnitude" to warrant corrective action. In doing so, it found that Dodson's performance had improved late in his career and that his commanders had recommended him favorably, but that this was "simply too little-too late" in light of Dodson's "overall performance and potential." The ABCMR determined that the Promotion Selection Board's reliance on the erroneous EER 110 did not provide a basis for corrective action because the board had cited seven other EERs and a nonjudicial punishment for theft. Finally, the ABCMR noted that the Reenlistment Appeals Board had reviewed Dodson's record after removal of the erroneous EER 110. Thus, the ABCMR denied the application, concluding that Dodson had failed to submit sufficient evidence to demonstrate the existence of probable material error or injustice.

Id. at 1203.

> Before the Federal Circuit,
>
> Dodson argue[d] first that the ABCMR erred under the QMP by not correcting his OMPF to include the EER 124. He further argue[d] that because the erroneous EER caused the reenlistment bar, the ABCMR should have further lifted the bar, reenlisted him, and awarded him back pay. The Army argues that substantial evidence supports the decision of the ABCMR that Dodson had been barred without probable material error or injustice because of Dodson's entire military history of below average performance. It contends that the Promotion Selection Board instituted the bar based on eight below average EERs, the erroneous EER being only one of them, that the Reenlistment Appeals Board did not rely on the EER 110 when it denied Dodson's individual appeal and affirmed the decision of the Promotion Selection Board, and that the ABCMR reconsidered the bar with the advice of MILPERCEN, thereby curing any procedural irregularities. Essentially, the Army argues, as the ABCMR found, that Dodson's evidence—one EER 124—is "simply too little-too late."

Dodson v. United States, 988 F.2d at 1205 (alterations added). The Federal Circuit determined that

> [i]n this case, the Army has entirely bypassed the requirements of the QMP in barring Dodson. It is undisputed that "the individuals who had the legal responsibility [under the QMP] to rate [Dodson] and who were in a position to observe his performance on a daily basis," Grieg [v. United States], 640 F.2d [1261,] 1267 [, 226 Ct. Cl. 258, 268 (1981)], gave him an

EER 124. The EER 110 is not simply an "unfair" rating. It is a fiction, and the EER Appeal Board necessarily found to this effect in ruling in Dodson's favor. Under Army regulations, the Promotion Selection Board was required to render a decision from Dodson's OMPF. The procedurally defective rating rendered defective the OMPF that was before the Promotion Selection Board, and the Board explicitly told Dodson that it based the bar to reenlistment in part on his EER 110. This was the unfortunate, fortuitous result of the Promotion Selection Board rendering its decision before the decision of the EER Appeal Board, and the absence of coordination between the two boards. Further, the Reenlistment Appeals Board considered Dodson's appeal on an OMPF containing a third, admittedly erroneous EER—"Unrated, EER Appeal"— and the ABCMR addressed only the irrelevant question whether that EER would have made a difference over the EER 110.

Dodson v. United States, 988 F.2d at 1205 (second and third alterations in original).

The Federal Circuit then adopted the language quoted above by plaintiff in the above captioned case:

The ABCMR reviews selection decisions for error; it does not, contrary to the Army's repeated assertion, make selection decisions on a de novo basis. Therefore, the ABCMR's mere consideration of a defective personnel decision does not cure the defect. Nor will a post hoc advisory opinion given by a MILPERCEN administrator to the ABCMR cure an otherwise erroneous selection decision. The ABCMR may potentially "remedy" an error which it has found to have occurred in a selection decision by ordering a new selection board convened to make the decision de novo. See Doyle v. United States, 599 F.2d 984, 998, 220 Ct. Cl. 285 (1979). However, a simple advisory opinion by MILPERCEN does not "undertake the exhaustive reevaluation that a normal, regular selection board does." See id., 599 F.2d at 1001.

Dodson v. United States, 988 F.2d at 1206. In Dodson, the Federal Circuit explained

no one disputes that Dodson attained an EER 124. Yet remarkably through all of Dodson's appeals the EER 124 was never placed in his OMPF. Rather, the Reenlistment Appeals Board, the JAG and MILPERCEN in their advisory opinions to the ABCMR, and the ABCMR itself all considered Dodson's case with an EER for the period in question, "Unrated, EER Appeal." The most critical item in a soldier's personnel file is his EER. "[I]f it is low or compares unfavorably with those of his peers, it is fatal to his chances of selection." Skinner [v. v. United States], 594 F.2d at 831 n. 4; Army Reg. 623–205, para. 1–4.a (1984) (The EER system "largely determines the senior enlisted leadership of the Army."). Unexplained gaps in a personnel file also are highly prejudicial. Sanders

> [v. United States], 594 F.2d [804,] 819[, 219 Ct. Cl. 285, 312 (1979)].
> Thus, we cannot agree with the Army that Dodson has suffered no
> prejudice as a result of the Army's violation of the QMP, or that the
> prejudicial error has been cured. We are also convinced that the Army
> committed statutory and regulatory violations during the course of the
> administrative reviews of Dodson's case.

Dodson v. United States, 988 F.2d at 1206 (first alteration in original).

   None of the factual issues raised by Dodson are present in plaintiff's case, as
plaintiff case does not address a factual error in plaintiff's military records, nor does the
case involve the Promotion Selection Board. Instead, plaintiff is challenging the BCMR's
decision to uphold the plaintiff's "General Discharge, for Misconduct, due to
Commission of a Serious Offense."

   Additionally, the court does not agree with plaintiff that the BCMR relied on any
"post hoc rationalization" in reaching its conclusion that plaintiff violated Article 107 of
the UCMJ. The BCMR's determinations were consistent with the explanations of the
Administrative Separation Board and the Final Reviewing Authority when the
Administrative Separation Board and the Final Reviewing Authority issued their
respective decisions finding that plaintiff had lied when he denied telling Mr. Wiggins
that he that he planned to ensure that the Christopher McKibben and Britany McKibben
were transferred to different units, so that the McKibbens would break up and plaintiff
could marry Britany McKibben.

   As described above, the Coast Guard convened an Administrative Separation
Board in December 2015 and the Administrative Separation Board reviewed Lieutenant
Newcomb's Preliminary Inquiry Officer Report, heard testimony from Lieutenant
Commander Lalor, and heard testimony from fifteen witnesses called by plaintiff. The
Administrative Separation Board concluded "[t]here is enough evidence to support, by a
preponderance of the evidence, a violation of Article 107, UCMJ, with regard to
Respondent lying to the PIO about certain statements he made about wanting to break
up the McKibben's marriage." (alteration added).

   Similarly, in August 2017, the Final Reviewing Authority issued a decision,
finding:

> I have reviewed the rebuttal comments from MSTC Reinhard's counsel,
> which assert that the evidence regarding the violation of Article 107,-
> UCMJ, was not supported by a preponderance of the evidence. However,
> the [Administrative Separation] Board Report contains sufficient evidence
> to support a finding, by a majority of the Board Members, that MSTC
> Reinhard made a false statement in violation of Article 107, UCMJ. The
> Board heard testimony from MSTC Reinhard and was able to assess his
> credibility to determine if he should be believed over other witnesses and
> evidence. The Board also pointed to multiple exhibits which they

considered to determine whether or not MSTC Reinhard violated Article 107, UCMJ. In addition to the unsworn statement summary from Mr. Wiggins, the Board Members also noted written statements from Coast Guard members with information that led them to conclude that the statement from Mr. Wiggins was accurate. This is noted in Finding of Fact #31, which points to Exhibits 17, 18, 21, 27 and 28. In Finding of Fact #31, the Board stated: "Several members noted that Respondent had made other uncomfortable and suggestive comments about MST2 Brittany McKibben." Finding of Fact #31 was highlighted in the Recommendations of the majority of the Board Members that a preponderance of the evidence supports separation, with a General Discharge, without probation or the opportunity to retire.

(alteration added). Therefore, the court does not find that the BCMR made any "post hoc rationalization" about Lieutenant Newcomb's Preliminary Inquiry Officer Report and, consistent with the court's earlier determination, plaintiff has failed to demonstrate that "the Board's decision was arbitrary and capricious, contrary to law, or unsupported by substantial evidence." Stahl v. United States, 167 Fed. Cl. at 673 (citing Chambers v. United States, 417 F.3d at 1227).

## CONCLUSION

For the foregoing reasons, plaintiff's motion for judgment on the Administrative Record is **DENIED**. Defendant's cross-motion for judgment on the Administrative Record is **GRANTED**. Plaintiff's complaint is **DISMISSED**. The Clerk's Office shall enter **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**